THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* FRANK VELILLARI *et al.*, Defendants-Appellants.

Fifth District   No. 77-566

Opinion filed May 21, 1980.

John R. Reid, of State Appellate Defender's Office, of Mt. Vernon, for appellants.

Charles Garnati, State's Attorney, of Marion (Raymond F. Buckley, Jr., and Curtis L. Blood, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

Defendants Frank Velillari and Ronald Roland Wolf were charged by 28-count informations with armed robbery, aggravated battery, robbery, and unlawful restraint. William Rodely, a co-defendant who was tried with Velillari and Wolf, is not involved in this appeal. Following their jury trial, Velillari and Wolf were each convicted of armed robbery, aggravated battery and unlawful restraint and sentenced as follows: Velillari, 10 terms of 30 to 100 years for armed robbery, three terms of three years four months to ten years for aggravated battery, and five terms of one to three years for unlawful restraint, all to run concurrently; Wolf, the same, except each armed robbery term was 100 to 200 years. The cases were consolidated for appeal.

Defendants raise the following as grounds for reversal: (1) refusal of their offer of proof relating to another alleged perpetrator of the crime; (2) the State's Attorney's repeated questions of defendants as to whether

State's witnesses were lying; and (3) the State's Attorney's closing argument. Also, they maintain convictions as to certain counts must be vacated as duplications and that other counts on which Velillari was sentenced were not submitted to the jury. Finally, they seek reduction of their sentences.

Approximately 40 witnesses testified at the seven-day trial. Our disposition of the issues raised requires that the testimony be summarized at some length. The victims' testimony reveals the following.

The events in question occurred late December 2, 1976, and early on December 3. That evening two men entered the home of the Ruggieri family in Herrin. Mr. Ruggieri was next door in Chevie's Lounge which he owned and operated. Mrs. Ruggieri was sleeping in an upstairs bedroom. Their 18-year-old twin sons, Steven and Phillip, and their friend, Tim Whitecotton, were sleeping in the basement.

The intruders woke Mrs. Ruggieri and bound her, then woke the boys and marched them to her bedroom. The hands of the victims were handcuffed behind their backs; their legs were taped together, and their mouths were taped. An exception was Whitecotton, whose hands were only taped. The telephones were torn out.

The victims' descriptions of the intruders vary somewhat, apparently due in part to the intruders' efforts to keep the lights low. The victims generally agreed one intruder wore green coveralls and the other a much darker suit of coveralls. One may have worn an overcoat. Both wore gloves and ski masks. One wore gold-rimmed glasses. One carried a handgun which he said was a .357 Magnum. Height estimates varied widely. Whitecotton testified one intruder almost stepped on his nose with tan suede boots. One intruder addressed the other on one occasion as "Ron," then apologized. The victims were continually threatened with death if they failed to remain quiet and cooperate.

One intruder carried a citizens' band radio-transmitter, through which he addressed someone as "Old Bearded One." Apparently he wore an earphone, as the victims could not hear messages received. They did hear him tell the other intruder about "someone talking to a policeman," after which they heard a car with unmuffled exhaust drive away.

Mr. Ruggieri closed the lounge around 2 a.m. and went home. The intruders ambushed him at the door and led him upstairs to the rest of his family. Despite their threats of death and harm he denied having a safe in the house. They pistol-whipped him, knocked him down, and kicked him. They taped his hands together, his feet together, and taped his mouth. One intruder poured lighter fluid on Steven, Mr. Ruggieri and Whitecotton, held a lighter flame as close as one-half foot to Steven's head, and again demanded the safe's location. The victims insisted there was no safe and the flame was extinguished.

The intruders instructed the boys to tell police "niggers" had robbed them and that they would be killed later if they did otherwise. The intruders left in Mrs. Ruggieri's car. The major items taken in the robbery were several watches, a large amount of jewelry, including a man's cluster diamond ring, two guns and approximately $4000 in cash.

Whitecotton and Mr. Ruggieri, whose hands were only taped, got free first. The victims walked to a restaurant across the street where police removed their handcuffs. Mr. Ruggieri was hospitalized for two days for a head cut and bruised ribs.

Mr. Ruggieri testified that defendant Velillari was in his lounge for a long time and left at closing time. Mr. Ruggieri recalled what Velillari had been drinking and much of their conversation. All the victims except Mr. Ruggieri saw Velillari at the restaurant after the robbery. Velillari admitted his presence at the lounge and the restaurant. He denied asking the Ruggieris whether "niggers" had robbed them, contradicting testimony of some witnesses that he had made such a comment.

A key State's witness was Robert Phelps, who admitted being the "Old Bearded One" and driving the getaway car. He received a negotiated sentence of three to nine years for the instant offense, in part in exchange for his testimony. Phelps testified he, Velillari, Wolf and William Rodely discussed the Ruggieri robbery on the evening of December 2, 1976, at Cheryl Robinson's house. Phelps drove the men to the lounge to investigate the premises. While there, Phelps' car lost its muffler in the parking lot. They returned to Ms. Robinson's. Their plan was that Velillari would be in the lounge as a lookout and be the last to leave. Velillari left Ms. Robinson's house in Keith Girten's Monte Carlo, which was brown with a dark vinyl top. Rodely and Wolf wore coveralls and ski masks. Rodely wore green boots; Wolf wore suede shoes. Phelps dropped Rodely and Wolf off in the parking lot behind Chevie's Lounge. Wolf had to return to the car to retrieve his gun. Phelps parked across from Chevie's. He had a citizens' band transceiver in the car, purchased by himself and Rodely. (A Carbondale Radio Shack employee who was also an art student testified Rodely was the purchaser. He drew a sketch of the purchaser for police, including a "pentangle" tattoo on the left hand which Rodely later showed the jury.) Phelps testified he obtained Rodely's .12-gauge sawed-off shotgun prior to the robbery and put it in the trunk of his own car. (Phelps was arrested with the shotgun in his car. Expert testimony later showed shotgun shells among Rodely's belongings when he was arrested had been loaded and ejected from that shotgun.) Phelps testified that during the robbery he had been run out of town by Officer Hubbard of Herrin. (Hubbard confirmed that Phelps had had a citizens' band radio and that he ran Phelps out of Herrin as a known unsavory character.)

It was shown that Phelps had a piece of paper in his possession when arrested which bore the name "Frank" and a telephone number. The number corresponded to a Mt. Prospect, Illinois, address. An investigator recorded the license plate number on a van parked there December 13, 1976. That plate was registered to Velillari. One Donna Davis testified that the same telephone number appeared on her telephone bill as having been called December 3 at 11:46 p.m. Ms. Davis did not call that number. Rosie Logsdon lived with Davis, and Rodely often visited Logsdon. Rodely had paid Davis previously for calls to the same number.

It was shown that on the way to the robbery Rodely brushed his hair with a brush from Phelps' car. An FBI agent's microscopic examination of hair from that brush and a sample of Rodely's hair showed the hair from the brush "could have been" Rodely's.

Cheryl Robinson corroborated the December 2 meetings at her home just north of Marion. She was in the living room with Phelps (her "lover") and could not hear the other three men in the kitchen. She admitted having given a false sworn statement to police about this case to help Phelps. She was unable to pick Wolf's photograph from a group the police showed her.

Rosie Logsdon also corroborated that the four men met at Ms. Robinson's, though she was asleep most of the time. Logsdon and Rodely drove Girten's Monte Carlo to Girten's home in Indiana on the morning of December 3. Velillari and Wolf drove there in Velillari's van. On the way, Rodely wondered aloud why Phelps had disappeared and had not called on the radio. At Girten's, Wolf, Velillari and Rodely sorted some items which Rodely tried to prevent her seeing, including a "clustered" diamond ring. (Mr. Ruggieri testified the intruders took his clustered diamond ring.) Ms. Logsdon and Rodely later moved to Midland, Texas, where Rodely was arrested. (Some of the victims were shown at trial a .357 Magnum handgun, coveralls, boots, gloves and a citizens' band radio which had been in Rodely's possession when arrested. They testified they were "similar" to those worn and carried by the intruders.)

Gerald Eldridge, who lived behind Chevie's, testified that he was disturbed by an unmuffled car behind the lounge about 1:30 a.m. December 3. Two people got out, one came back, and then both people walked away as the car drove off. He could not describe the car or the people.

One lounge customer testified he left Chevie's about the same time Velillari did, that Velillari got into a black over brown Monte Carlo, and that he did not drive away while the witness could see him. (Velillari testified he had been driving his green van.)

At the close of the State's case in chief, Rodely pleaded guilty to the charges against him.

Defendants' evidence was as follows. Velillari testified in his own behalf that his business as a used motorcycle dealer took him to Cape Girardeau on December 2. His green van had radiator trouble there, and he had it repaired. He was supposed to drive to Terre Haute next, but he became lost, ending up in Herrin about 11 p.m. He admitted his presence in the lounge before the robbery and in the restaurant afterward, but denied entering a Monte Carlo when he left the lounge. He testified that more trouble with his van after he left the restaurant had caused him to change his plans and drive home to Chicago. He denied knowing Wolf, Rodely, Phelps, Cheryl Robinson and Rosie Logsdon.

Wolf testified in his own behalf that he lived in Harvey, Illinois (a Chicago suburb), and was a dealer in Mexican imports. He arrived in Dallas, Texas, on a business trip the morning of December 1 and spent that night and the next with one Carol Behnke. He did not know her whereabouts at the time of trial. On December 3 he drove toward Wichita Falls. Wolf denied knowing Velillari, Phelps, Robinson, Girten and Logsdon. He admitted knowing Rodely from the Leavenworth penitentiary and seeing him occasionally after their release.

William Rodely testified for defendants that he lived in Chicago. By chance he met Phelps, whom he knew from Menard, at a Jackson County, Illinois, bar in November of 1976. There, Phelps told him of the Ruggieri robbery plan and enlisted his help. Rodely returned to Chicago and arranged the help of one "Rob" who knew how to open safes. They met on December 2 in Marion. Rodely, Phelps and Rob went to Ms. Robinson's house where Rodely was staying. Ms. Logsdon was there. Rodely introduced Rob as "Frank," as Rob did not want his real name used. Rob drove a blue van, Rodely a Monte Carlo. Rodely's testimony as to the meetings at Ms. Robinson's home, the attire of the intruders, and events inside the Ruggieri home corroborated that of Phelps and the victims. According to Rodely, it was Rob who forced the house door and who poured lighter fluid on the victims. Rodely stated Rob knocked Mr. Ruggieri down, though Rodely admitted kicking him. He testified he protested Rob's use of force. He and Rob divided the proceeds of the robbery in Rob's van, Rob taking the guns. Rodely admitted having left the Ruggieri car in a parking lot. He denied knowing Velillari. He knew Wolf from Leavenworth but denied Wolf was involved in the robbery. He denied knowing where Rob lived. He admitted paying Donna Davis for long distance calls but would not admit the Mt. Prospect call about which she had testified. Rodely admitted having called Davis July 16, 1977, but denied telling her Wolf had threatened him. Shown a photograph of one Robert Summerville, Rodely testified that Summerville was the "Rob" involved in the instant robbery. He noted as distinguishing characteristics Summerville's glasses and broken nose.

Defendants' examination of their next witness, Officer Forrest Sloan of Bridgeview, Illinois, was limited by the trial court's ruling on a motion *in limine* by the State. In accordance with that ruling Sloan was permitted to testify that he found Summerville in possession of Mrs. Ruggieri's gun in Bridgeview on June 11, 1977, and that Summerville had since died. He was not allowed to testify that Summerville was committing an aggravated assault at that time, that he made certain threats and that he had a record of prior criminal offenses.

In rebuttal for the State, Donna Davis testified Rodely called her on July 16, 1977, and said he and Wolf had argued and Wolf had threatened him. Rodely also said he would try to "have some of the heat taken off" Velillari. Two officers who transported Velillari to Marion for trial testified Velillari told them Rodely had worked for him in Chicago and that he had met Rodely at Leavenworth. One officer testified Wolf told him he and Velillari sometimes ate together at restaurants. A Chicago board of education supervisor, who supervised Summerville at the time in question, testified from his records that Summerville left work at 5:30 p.m. December 2, and returned December 3 at 10:15 a.m. He testified he saw Summerville at 4:30 December 2, at work. Taking into account heavy traffic conditions usual in late afternoon on a weekday, he estimated it would take 45 minutes to drive from work to the outskirts of Chicago. Officer Sloan estimated it would take 6½ hours to drive from that location, beginning at rush hour, to Marion, even driving in excess of 55 miles per hour.

Defendants first urge as error the trial court's ruling limiting Officer Sloan's testimony about Summerville's criminal record and what Summerville said and did when he was found in possession of Mrs. Ruggieri's gun. Defendants urge that this ruling prevented them from developing their theory of the case that Summerville, not Wolf, entered the Ruggieri home. The State responds that (1) the issue was waived because no post-trial motion had been filed; (2) these matters were not sufficiently relevant to the question of defendants' guilt to permit their proof; and (3) any error as to this issue must be deemed harmless in view of the evidence of guilt adduced.

■■ While the lack of a post-trial motion would justify this court's refusing to consider this and several other issues raised on review (*People v. Harrawood* (1978), 66 Ill. App. 3d 163, 167, 383 N.E.2d 707), we are authorized to relax the general waiver rule as a matter of grace to consider "plain errors affecting substantial rights." (*People v. Harrawood.*) We have accordingly elected to consider whether defendants were improperly prevented from presenting their theory of the case to the trier of fact.

Defendants offered to prove that when Summerville was found with

Mrs. Ruggieri's gun he was arrested while committing an aggravated assault and had threatened to shoot a motorist in the head. Further, they sought to show that he was a convicted felon. Defendants urge that Summerville's words and actions and his prior record tend to increase the probability that Summerville, not Wolf, committed the instant offenses with Phelps and Rodely and corroborate Wolf's and Velillari's defenses and thus were relevant and admissible. Defendants urge that the test of admissibility is not whether the evidence conclusively proves a proposition in issue but whether it tends to make it more or less probable.

■▌It is well established that one accused of a crime may prove any fact or circumstance tending to show that someone else committed the crime. (*People v. Nitti* (1924), 312 Ill. 73, 143 N.E. 448.) But evidence offered for that purpose must be sufficiently relevant. (*People v. Tillman* (1969), 116 Ill. App. 2d 24, 253 N.E.2d 873; *People v. Nitti.*) It is difficult to define the precise limits which control admission of such evidence. (*People v. Nitti.*) Remote conduct of the other person not connected with the crime at bar may not be shown. *People v. Nitti; People v. King* (1978), 61 Ill. App. 3d 49, 377 N.E.2d 856.

In our opinion this issue was inappropriately raised as to Velillari. Velillari admits his presence at the lounge and, later, the restaurant as alleged by the State. He made no attempt to prove someone else did the acts he is alleged to have done. That Summerville did those acts is the sole inference Velillari could have drawn from the proof defendants offered as to Summerville. The offer was made to show Summerville, not Wolf, entered the Ruggieri home. There was no attempt to show that someone other than Velillari acted as lookout in the lounge. We find the offer of proof properly denied as to Velillari.

While acceptable proof that Summerville committed the instant offenses would be of probative value as to Wolf, we find the evidence of Summerville's remote acts lacking in relevance as proof of Summerville's participation. What Summerville did seven months later sheds no real light on whether he was one of the instant intruders. His criminal record is also irrelevant with respect to the time and place in our focus, and there was no showing that any of Summerville's prior offenses were similar to the Ruggieri robbery. We also note that the inference defendant seeks to draw—that offenses by an individual tend to prove his guilt of other offenses—would be impermissible if applied to a defendant by the State. *People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288.

■▌We conclude that the trial court properly refused portions of defendants' offer of proof. The relevancy of a fact in controversy or a matter in issue as evidence of a possible defense is a matter for the sound discretion of the trial court and where the record indicates a sufficient basis for that decision and there is no abuse of discretion to the prejudice

of the defendant, this court will not disturb it. (*People v. Gardner* (1977), 47 Ill. App. 3d 529, 362 N.E.2d 14.) We need not consider whether any error would have been harmless since we find no error. We note in that regard, however, the great weight of evidence of guilt adduced, the collateral nature of the proof refused, and that Rodely was permitted to testify at length that he committed the robbery with Summerville.

■ We turn to defendants' contention that reversible error occurred when the prosecutor repeatedly asked Velillari, Wolf, and Rodely, whether various State's witnesses were lying. The State does not contend the questions were proper. It is improper to ask a defendant's opinion concerning the veracity of other witnesses. (*People v. Graves* (1978), 61 Ill. App. 3d 732, 378 N.E.2d 293; *People v. Castillo* (1976), 40 Ill. App. 3d 413, 352 N.E.2d 340.) We could properly deem the issue waived, as there was no post-trial motion and, with very few exceptions, no objections to the questions of which defendants complain. Since the questions were improper, we have elected to consider whether they were harmless beyond a reasonable doubt. We find that they were. The evidence of guilt in this case was so great that we can reach no other conclusion. Aside from testimony of Phelps, Robinson, and Logsdon tying these defendants directly to the robbery, a wealth of corroborative detail linked them to these offenses. Neither Velillari nor Wolf produced a corroborated alibi or other affirmative matter which might cast doubt as to their guilt. Under *Castillo* we find no ground here to order a new trial.

■ We next consider the issues raised by defendants as to the propriety of the State's Attorney's closing argument. The State argues defendants waived their objections thereto by failure to file a post-trial motion and failure, in almost every instance, to object during the argument. We agree. We hold all of defendants' contentions as to closing argument waived because no post-trial motion was filed (*People v. Harrawood*), and for failure to make objection to the argument at the time it was made (*People v. Moore* (1973), 55 Ill. 2d 570, 304 N.E.2d 622).

Despite our conclusion that the issues were waived, we have examined each of the complained-of comments in the State's Attorney's closing argument. It is our view that even if we did reach the merits of defendants' objections to the argument, the comments were not sufficiently egregious to justify a new trial. The weight of evidence of guilt here adduced is such that closing argument would have to have been egregious indeed to have been a factor in defendants' convictions by the jury.

■ We now consider defendants' contentions that their convictions must be vacated as to several counts. The People concede that the convictions must be vacated as to several counts duplicative of other counts on which

defendants were convicted and sentenced. First, we note convictions were had as to 10 counts of armed robbery per defendant. There were four armed robbery victims, Mr. and Mrs. Ruggieri and their two sons. Each defendant was charged with armed robbery twice per victim by alternate allegations that the taking was "by the use of force" and that it was "by threatening the imminent use of force." Further, each defendant was charged with two additional counts of armed robbery of Mrs. Ruggieri by alternative allegations that the taking was from Mrs. Ruggieri's "person" and that it was from her "presence." Obviously only one conviction per victim per defendant can stand. (See *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838.) Accordingly, defendants' convictions as to counts 2, 4, 5, 6, 8 and 10 are vacated as duplicative of counts 1, 3, 7 and 9.

On the same ground, duplicity, each defendant seeks vacation of two of the three convictions of aggravated battery. Mr. Ruggieri was the victim alleged in each count. The three counts alternately alleged defendants (1) caused great bodily harm, (2) caused bodily harm while armed with a deadly weapon, and (3) caused bodily harm while masked in such a manner as to conceal identity. Accordingly, defendants' convictions as to counts 27 and 28 are vacated as duplicative of count 26.

Of the counts remaining, defendant Velillari seeks vacation of conviction of count 9 which charged each defendant with armed robbery of Phillip Ruggieri. As in the other counts, Velillari was sentenced on it. The State concedes that no verdict form went to the jury on this issue and that none was returned. As defendant Velillari was not found guilty on count 9, conviction on that count and its corresponding sentence are vacated as to him.

In summary, we leave undisturbed Wolf's convictions as to armed robbery (four counts), unlawful restraint (five counts), and aggravated battery (one count). We leave undisturbed Velillari's convictions of armed robbery (three counts), unlawful restraint (five counts), and aggravated battery (one count). All other counts are vacated.

We proceed now to sentencing issues. Defendants seek a new sentencing hearing because of the counts vacated in this appeal. They urge that the trial court's sentencing decision was based upon an erroneous belief—*i.e.*, that the sentencing court was "wholly unaware that at least eight (8) of those counts [or forty-four percent (44%)] were invalid [but] proceeded to consider and pass sentence on all of them." Defendants rely upon *People v. Ross* (1978), 60 Ill. App. 3d 857, 377 N.E.2d 230. In *Ross*, the court found on appeal that the defendant's convictions for rape and indecent liberties rested upon a single act, vacated the latter conviction, and ordered the cause remanded so

defendant could be sentenced anew on the rape. In *Ross* the court recognized "the possibility hat both convicions were considered and reflected in the severity of the sentence imposed." 60 Ill. App. 3d 857, 865.

We find no indication here that the existence of the extra convictions caused the court to reach a sentencing conclusion other than that he would have reached in their absence. Apparently in *Ross* there was no affirmative indication in the record on appeal that the trial court properly perceived the situation. Here we do not think defendants were sentenced as a result of an erroneous belief. We note several facts supporting our conclusion. First, the sentencing court was the same court which presided at defendants' trial. Thus the court was apprised of the facts of the offenses in minute detail. He would not be as susceptible to confusion because of the number of charges as would a judge who did not hear the trial testimony.

Second, the fact that there was no verdict forthcoming as to Velillari on count 9 was called to the trial court's attention when the jury during deliberations sent him a note inquiring why there was no verdict form for that count. The court replied in a note that it was not to be considered.

Third, defendants early voiced their concern about the total number of counts charged. Velillari filed a lengthy written pretrial motion that the State be required to elect a lesser number of counts from the 28 counts charged and that the trial court dismiss the remaining counts. A hearing was had. Defense counsel argued that though Velillari was charged with 28 counts, there was but one robbery with five victims and that "[w]e know as a matter of fact, the Defendant cannot be tried, convicted and sentenced on all 28 of those * * *." Defense counsel also pointed out to the court, as we have done above, how the large number of counts was created by alternating the various allegations. The trial court denied the motion, conceding that Velillari could not possibly be convicted on all of the counts but concluding that the election could not be made until after the evidence was presented.

Also significant in this regard is the number of charges to which Rodely was permitted to plead guilty at the close of the State's case in chief: Three armed robberies, five unlawful restraints and one aggravated battery.

■■ We believe these facts show the trial court was not acting under a misapprehension at sentencing that all of the counts resulting in guilty verdicts represented valid convictions. It is our perception that the court refused to undertake the responsibility of vacating certain counts *sua sponte* (there was no post-trial motion, nor did defendants move after trial for vacation of counts or argue that they could not be sentenced on any count or counts). Rather, the court and the State's Attorney left it to this court to sort out the convictions and sentences. Though we prefer

issues be resolved in the trial court whenever possible, we find no reason here to order a new sentencing hearing. It is obvious to us that the court based its sentences upon the conduct of the defendants and their prior criminal records. The number of convictions that may have arisen from the acts of the defendants was not a factor in the length of individual sentences. They were made to run concurrently.

Next, defendant Velillari asks that we reduce his sentences of 30 to 100 years for armed robbery. He emphasizes he was merely a lookout. He also urges that those sentences are unusually severe and incompatible with the constitutional mandate that all penalties be determined "both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."

We note from Velillari's presentence report: He was born in Albania in 1939. He became a United States citizen by serving in the United States Army. He completed high school and some college in Albania; he received additional college credit while at Leavenworth. He has a history of steady employment. His prior convictions include "tavern open after hours," battery (two charges), resisting a peace officer (two charges), and one felony, the Federal offense of theft from an interstate shipment, for which he was imprisoned. His service record shows honorable discharge after 6 years service, and three convictions by courtmartial, one of them for theft. The presentence report includes the 1961 opinion of the chief of the Mental Hygiene Consultation Center at Ft. Devens, Mass., that rehabilitative measures would be fruitless in Velillari's case.

No witnesses were called at Velillari's sentencing hearing. Velillari made no statement. The court in pronouncing sentence was not of the opinion that rehabilitation was impossible but concluded that public safety was a paramount consideration in Velillari's case.

Though Velillari was sentenced to indeterminate terms of imprisonment under the "old" sentencing act, we note several factors the trial court would have been required to consider had Velillari been sentenced under the new act. Applicable aggravating factors include (1) defendant's conduct caused or threatened serious harm, (2) defendant received compensation (proceeds) for committing the offense, (3) defendant has a prior history of criminal activity, and (4) it is necessary to deter others from committing the same crime. (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—5—3.2(a)(1), (2), (3), (7).) From the statutory list of 12 factors to be considered in mitigation, if applicable, we find only one might apply here, the fact that imprisonment could entail hardship on Velillari's dependents. (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—5—3.1(a)(11).) That factor would be insignificant here, as a sentence in lieu of imprisonment is out of the question.

We have examined the circumstances of this especially heinous

offense, Velillari's prior criminal record, and the cases counsel cites for comparison. We find the sentencing court did not abuse its discretion as to Velillari's armed robbery convictions (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882), nor has Velillari rebutted the presumption that the sentence was proper (*People v. Choate* (1979), 71 Ill. App. 3d 267, 389 N.E.2d 670). Though severe, the sentences were in line with the seriousness of the offense. In this regard we specially note the lighter fluid incident. We do not view the fact that Velillari was a lookout as ameliorating the severity of the offenses. Upon this record, he was greatly responsible for the occurrence of the offenses. We find no significant ameliorating circumstances. We recognize in affirming Velillari's armed robbery sentences that "the ultimate objective of a sentence is the protection of society in all its broadest implications, and recognition is given to the fact that the vast majority of persons sentenced ultimately return to our society." *People v. Barger* (1972), 6 Ill. App. 3d 164, 165, 284 N.E.2d 731.

We are also asked to reduce Wolf's armed robbery sentences of 100 to 200 years. In pronouncing those sentences the trial court voiced his hope that Wolf never be permitted to walk the streets again.

Much of what we have said above for Velillari applies to Wolf as well. We need not detail the circumstances of the offense again. We do note the testimony indicates it was Wolf who carried the .357 Magnum revolver, pistol-whipped Mr. Ruggieri, poured lighter fluid on some of the victims' heads and held a flame near Steven Ruggieri, and threatened Mr. Ruggieri that his diamond ring would come off "one way or the other."

Wolf's presentence investigation reveals the following prior criminal convictions: (1) In 1969, attempt murder, involving the shotgun shooting of his then father-in-law; (2) In 1969, bail-jumping; (3) In 1969, gun control violation, involving his giving a false name to purchase a machine gun; (4) In 1970, aggravated assault and battery; and (5) In 1971, robbery by firearm (Texas).

Regarding (4) above, a Williamson County sheriff's investigator testified at Wolf's sentencing hearing regarding a conversation he witnessed between Detective Kobler and Wolf just after the instant verdicts. Kobler stated, "Ron, I understand you popped a cap on a cop in Indiana." Wolf replied, "Yeah, and I am sorry I didn't kill the son of a bitch, that was the only mistake I made."

The officer shot in that incident also testified at sentencing. Carl Tyner, then of the Indiana state police, was in a marked squad car when he had occasion to try to apprehend Wolf and another man in connection with an armed robbery. After a high speed chase, Wolf's car stopped. Wolf and his passenger opened fire on the officer with a .30-caliber rapid

fire carbine and a .12-gauge shotgun respectively. Tyner, who had run behind his own car, returned the fire. He was wounded in both legs by the shotgun. Tyner's car sustained extensive damage and was undriveable. The windshield and part of the steering wheel were blown away and two carbine bullet holes were in the driver's seat back. Wolf eluded the ensuing manhunt.

■■ We find no basis to reduce Wolf's armed robbery sentences. They are severe indeed, but in view of the facts of these offenses and Wolf's substantial history of violent crime, we find neither an abuse of discretion (*People v. Perruquet*) nor that he has rebutted the presumption that his sentence was proper (*People v. Choate*).

We cannot agree with defendant that these sentences serve no useful sentencing goal. The paramount goal is protection of the public. In Wolf's case rehabilitation may well be impossible, and we cannot fault the trial court for so concluding and sentencing with that goal in mind.

We therefore affirm the judgment of the circuit court of Williamson County with the exception of the following counts, which are vacated as to both defendants: counts 2, 4, 5, 6, 8, 10, 27 and 28. Also vacated as to Velillari only is count 9.

Judgments affirmed in part and vacated in part.

KARNS and HARRISON, JJ., concur.