THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MARRION LOGAN, Defendant-Appellant.

First District (1st Division)    No. 78-779

Opinion filed August 4, 1980.

James J. Doherty, Public Defender, of Chicago (Timothy K. McMorrow, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE CAMPBELL delivered the opinion of the court:

This is an appeal of a conviction after a jury trial wherein the defendant, Marrion Logan, was found guilty of the murder of Phyllis Anderson, and the attempt murder and aggravated battery of Leo Anderson. The trial court ruled that the aggravated battery merged with the attempt murder and sentenced the defendant from 200 to 600 years each for murder and attempt murder, the sentences to run concurrently. The defendant argues: (1) the trial court committed reversible error in admitting into evidence material seized in a warrantless search of the defendant's residence and without defendant's consent; (2) that reversible error was committed in refusing to allow testimony of an act similar in time, place and *modus operandi*, but not involving the defendant; and (3) the jury foreman's experience and knowledge of the circumstances on the night of the murder, which were not revealed during the voir dire examination, tainted the jury and deprived the defendant of a fair trial.

On the night of June 13, 1976, a severe rainstorm caused flooding in the viaducts and expressways of Chicago. Many cars were stalled or forced off the expressways due to the flooding. On this particular day, Leo Anderson, his wife, Phyllis, and their three children, Elizabeth, Janet and Michael, ages 16, 15, and 13 respectively, were returning from a cousin's graduation in Lansing, Illinois, to their house in Buffalo Grove, Illinois. Leo Anderson was driving a station wagon north on the Dan Ryan Expressway, but due to extreme flooding, left the expressway at 87th Street and drove north on State Street until he came to a railroad underpass which was also flooded. Leo Anderson testified that he turned trying to find a way until he drove east on 69th Street where two black youths told him he could not drive through unless he paid them $10. Anderson refused to pay and then tried to turn around but was prevented

by the traffic going in the opposite direction. As Anderson continued east on 69th Street, his car was pelted with stones. Anderson then heard shots and turned his head to the right to the passenger's side and saw a man with his hands together outstretched, aiming a gun at the station wagon.

Anderson testified that he saw flashes and that the man continued to shoot and move closer to the car. Leo was struck in the shoulder and throat, and his wife was struck by the final shot. Shortly thereafter, the police arrived and took Leo Anderson and his wife to the hospital. Phyllis Anderson died of a bullet wound to the mouth and brain. On June 14, Anderson identified clothes which he said looked like the clothing the assailant was wearing. The next day, Anderson identified Marrion Logan, the defendant, as the man who fired the gun.

Elizabeth Anderson and four other witnesses also testified about the incident. Their testimony established that the defendant went into a house on 69th Street and returned with a gun. The defendant then stood behind a tree and fired several shots at the station wagon. The defendant's hands were extended forward as he fired the gun. After the shots were fired, the defendant hid what appeared to be a gun. The defendant's clothing was identified, and Elizabeth Anderson and another witness, Terry Robinson, identified the defendant as the assailant.

The defendant did not question the sufficiency of the evidence. However, his initial argument related to the hearing on a motion to suppress the evidence seized in two searches of the defendant's living quarters. The defendant lived with his fiancee, Mary Ann Williams, in the basement of a house located at 345 West 69th Street. The house was owned by Joseph Rogers, and his wife, June Rogers. Mrs. Rogers was also Mary Ann Williams' sister. There was no written lease agreement and neither Joseph Rogers nor the defendant produced rent receipts at the hearing.

The basement had formerly been a recreation room, and the furnishings consisted of a couch, pool table, bar, and a double bed. The defendant used the kitchen and bathroom facilities located upstairs in the house. There were two doors to the basement. The door on the west wall led directly outside and the defendant and Mary Ann Williams had the keys to this door. The door on the east wall led from the basement to the house upstairs and could be locked from the inside. The record indicated that a washing machine was located near the door on the east wall.

It was also established that if Joseph Rogers had difficulty with the heating unit, he would have to walk through the basement. In the same area as the heating unit was a toilet, wash basin, water meter, and a clothes line.

On June 14, the day following the incident, police officers, Crenshaw, Parizanski, and Davis, came to the Rogers' house at approximately 6:30

p.m. Officer Crenshaw had a conversation with the defendant and asked the defendant for the gun used in the homicide. Crenshaw testified that the defendant denied having the gun and told the police officer that he could search his apartment. Also, Officer Parizanski obtained a written consent to search from Joseph Rogers.

In the first search, the officer found a .12-gauge shotgun, a .32-caliber revolver, and a cartridge belt containing .45-caliber ammunition. The officers did not seize the cartridge belt in the first search. The record indicated that in the first search the officers seized the defendant's clothes and weapons. After learning that a .45-caliber pellet had been removed by surgery from Leo Anderson's neck, the police officers returned to Rogers' house. Joseph Rogers signed a second consent for search form, and the police officers seized the cartridge belt containing the .45-caliber ammunition.

The defendant argues that the second search, in which the officers seized the cartridge belt, was unreasonable since there was a landlord-tenant relationship and therefore his landlord could not consent to the search. Alternatively, the defendant argues that if a landlord-tenant relationship did not exist, the defendant had a reasonable expectation of privacy. At the hearing on defendant's motion to suppress, Officer Crenshaw testified that the defendant invited the police to search the premises. This fact alone supports the trial court's denial of defendant's motion to suppress. In addition to the defendant's oral consent, a reading of the record reveals the trial court also relied upon the written consent of Mr. Rogers, a person with common authority over the premises.

As to the second search, the defendant cited *Chapman v. United States* (1961), 365 U.S. 610, 5 L. Ed. 2d 828, 81 S. Ct. 776, for the proposition that the landlord Rogers could not consent to a search of the premises. In *Chapman*, the landlord visited the rented premises but did not receive a response from the tenant. He smelled the odor of alcohol and after notifying local officials, permitted them to enter the premises. The officials entered a locked window and found a distillery. A motion to suppress the evidence seized from the rented premises was denied and the defendant was convicted of illegal operation of a distillery. The court reversed, holding that the landlord could not consent to a warrantless search of the premises.

In response, the State argues that *Chapman* does not apply for the reason that the trial court made a finding of fact that negated the existence of a landlord-tenant relationship. Rogers testified that he had access to the basement for inspection of the water meter and to check the heating unit. The defendant's testimony indicated that when he was at work, members of the Rogers family might have entered the basement to use the pool

table and to fold clothes after washing. The defendant also used the kitchen and bathroom facilities located upstairs in the house. In addition the record indicated that the only furniture the defendant owned was the double bed, and that most of the furniture in the basement belonged to the Rogers. Also neither the defendant nor Joseph Rogers produced any rent receipts for the eight weeks in which the defendant resided at the house as evidence of payments of $35 per week rent as defendant claimed. Consequently, the general living arrangements of the defendant failed to support a landlord-tenant relationship and the trial court was correct in ruling that a landlord-tenant relationship did not exist.

The defendant argues that he had a reasonable expectation of privacy pursuant to *Katz v. United States* (1967), 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507, and *People v. Nunn* (1973), 55 Ill. 2d 344, 304 N.E.2d 81. In *Katz* the defendant was convicted of transmitting wagering information by placing telephone calls across State lines. The defendant's telephone conversation was recorded by electronic listening and recording devices from outside the telephone booth. The court concluded that the defendant had a reasonable expectation of privacy and that the eavesdropping devices were a search and seizure within the meaning of the fourth amendment. In *Nunn*, the defendant's mother permitted a search of her son's locked quarters, consisting of a bedroom and a kitchen without his consent and without a search warrant. In affirming the trial court's granting a motion to suppress the physical evidence, the court, relying on *Katz*, overruled the previous line of cases in Illinois inconsistent with *Katz* and held that the defendant had a reasonable expectation of privacy and that no valid waiver of rights had been made.

■■ Subsequent to *Nunn*, the Supreme Court in *United States v. Matlock* (1974), 415 U.S. 164, 39 L. Ed. 2d 242, 94 S. Ct. 988, rendered a decision in which a third-party consented to a warrantless search of a bedroom without permission from one of the co-inhabitants. The court stated that consent to search is not limited to proof that the defendant consented but that a third party who had common authority or other sufficient relationship to the premises or effects permitted the search. Footnote seven of *Matlock* states:

> "7. Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements [citations], but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own

right and that the others have assumed the risk that one of their number might permit the common area to be searched." 415 U.S. 164, 171, 39 L. Ed. 2d 242, 250, 94 S. Ct. 988, 993.

The Illinois Supreme Court in *People v. Stacey* (1974), 58 Ill. 2d 83, 317 N.E.2d 24, conformed the search requirement in Illinois to *Matlock*. The court held that the expectation of privacy was irrelevant and found the validity of the search in that case was to be judged by the more objective common authority test of *Matlock*.

■■ Applying the common authority test of *Stacey* and *Matlock* in the instant case, Joseph Rogers had the authority in the absence of a landlord-tenant relationship to permit a search of the basement.

The defendant next argues that reversible error was committed in refusing to allow testimony of a similar act in time, place, and *modus operandi* that did not involve the defendant. During the trial, defense counsel submitted an amended list of witnesses, including Irene and Robert Miroballi, who were also involved in a shooting incident on June 13. The defense counsel sought to establish by the testimony of the additional witnesses that the person who shot at the Miroballis was also the same person who shot at the Andersons. The trial court sustained the State's motion to strike the amended list ruling that the testimony of the witnesses was not probative. However, defense counsel was allowed to make an offer of proof.

The offer of proof reflected that the evidence technicians recovered a copper-jacketed fragment which was determined to be a .45-caliber core from the Miroballis' car. The offer also established that Irene and Robert Miroballi were involved in a shooting incident in the general vicinity of the Anderson shooting about an hour later and that they were shot at by a man in a manner similar to the Anderson incident. The assailant held a gun with both hands and shot at the Miroballis while they were in their car. The Miroballis would have testified that the man who shot at them was definitely not the defendant.

■■ The trial court may reject the evidence which the court determines to be of little probative value because of its remoteness, uncertainty or conjectural nature. (*People v. Gardner* (1977), 47 Ill. App. 3d 529, 362 N.E.2d 14.) Here, the trial court ruled that the testimony of the Miroballis and the evidence technicians about the shooting incident had little probative value. The attack on the Miroballis was too remote, occurring an hour after the attack on the Andersons, in addition to being several blocks from the incident in question. Under the circumstances the two incidents did not present any peculiar and distinctive feature common to both attacks. (*People v. Therriault* (1976), 42 Ill. App. 3d 876, 356 N.E.2d 999.) Given the lapse of time and the dissimilarity between the parties, the locations and the circumstances involved, we find no significant

connection between the two occurrences. See *People v. Durr* (1978), 58 Ill. App. 3d 525, 374 N.E.2d 873; *People v. Velillari* (1980), 84 Ill. App. 3d 333, 405 N.E.2d 466.

The above ruling of the trial court finds additional support in the record in that the testimony of the prosecution witnesses was sufficient to establish the defendant's guilt beyond a reasonable doubt. Leo and his daughter, Elizabeth Anderson, identified the clothes that the defendant wore that night. Their testimony also established that the defendant fired from the passenger's side of the car, killing Phyllis Anderson and wounding Leo Anderson.

The other witnesses' testimony indicated that the defendant left the house on 69th Street with a gun, and then fired several shots at the Anderson car from behind a tree. The defendant also was seen hiding what appeared to be a gun. Based on the testimony of the five witnesses, the jury had sufficient evidence to find the defendant guilty of murder and attempt murder of members of the Anderson family beyond a reasonable doubt. See *People v. Menendez* (1980), 84 Ill. App. 3d 1140, 40 N.E.2d 426.

The defendant's final argument is that the jury foreman's experience and knowledge of the circumstances of the night of the murder which were not revealed during the voir dire examination, tainted the jury and deprived the defendant of a fair trial. The defendant argues that Donald Ring, who was selected jury foreman, had a similar experience to the Andersons. Ring was forced to exit the Dan Ryan Expressway, and was assisted by black youths during the storm. Later, Ring was called as a juror in the defendant's case, but he did not inform the attorney or the trial judge in the voir dire examination about his experience that day.

After the defendant was found guilty, newspaper articles were written about Donald Ring's experience the day of the rainstorm. One of the articles stated that the reason Ring did not disclose his experiences was because the judge "might have thought it would have prejudiced my views." In another article Ring commented that participating as a juror gave him a chance to make sure the "Anderson family received justice."

The disclosure that Ring had knowledge of the events did not taint the jury or deprive the defendant of a fair trial. (*People v. Gendron* (1968), 41 Ill. 2d 351, 243 N.E.2d 208.) His experience was quite different from the Andersons. In the articles, Ring indicated that he had a positive experience in that he was assisted by the black youths. He stated that he did not feel threatened by the events of that night. Furthermore, it is speculative that defense counsel would have exercised a peremptory challenge if Ring's experience had been known.

Jurors do not have to be ignorant of the facts but must be able to lay aside their impressions or opinions and base their verdict on the evidence

presented in court. (*Irvin v. Dowd* (1961), 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639; *People v. Williams* (1968), 40 Ill. 2d 522, 240 N.E.2d 645.) Ring indicated in one of the articles that he had compared the testimony of the defendant and the other witnesses. Ring stated that there were "many contradictions in Logan's testimony" and that the other prosecution witnesses' testimony was consistent. Ring commented that he was convinced that the defendant was willing to lie about his involvement.

The defendant cited *People v. Oliver* (1977), 50 Ill. App. 3d 665, 365 N.E.2d 618, in which the juror had determined, based on a previous experience, that a victim did not forget the identity of a person who committed a crime. The court in *Oliver* concluded that the juror had a disqualifying state of mind. With such state of mind, the juror could not be uncommitted on the question of the defendant's guilt or innocence and prepared to weigh the evidence impartially. However, based on the articles in the instant case, it did not appear from Ring's experiences from that night that he had developed a preconceived opinion as to the defendant's guilt or innocence.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McGLOON and O'CONNOR, JJ., concur.