THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.*
WILLIAM JOHN POSEY, a/k/a Jim Scorpione, a/k/a Jim Santini, Defendant-
Appellee.

Fifth District   No. 80-456

Opinion filed July 30, 1981.—Supplemental opinion filed on denial of rehearing
September 25, 1981.

944

Robert W. Matoush, State's Attorney, of Salem (Martin N. Ashley, Gillum Ferguson, and Stephen E. Norris, all of State's Attorneys Appellate Service Commission, of counsel), for the People.

John H. Reid and Randy E. Blue, both of State Appellate Defender's Office, of Mt. Vernon, for appellee.

Mr. JUSTICE WELCH delivered the opinion of the court:

The State appeals from an order of the Circuit Court of Marion County suppressing the use at trial of certain evidence seized from a Texas motel room occupied by the defendant. At issue are the scope and voluntary character of the consent to search given to F.B.I. agents by defendant's girl friend and co-occupant of the motel room.

In the evening of February 11, 1980, William John Posey was arrested, in Mesquite, Texas, by Federal authorities for the murder of two women, one in Illinois and one in Vermont. On his person was discovered a key to Room 97 at the Motel Six in Mesquite. Posey was taken into custody and the manager of the Motel Six was instructed to "secure" Room 97. No law enforcement personnel were placed near the room to keep watch over it.

The following morning, at 9 a.m., F.B.I. Agents Clow and Llewellyn arrived at the motel. Both Clow and Llewellyn testified that their primary purpose was to see if the room was secure, but Llewellyn admitted that they also wanted to determine if any evidence was present in the room. Upon their arrival, the agents noticed that the curtains to Room 97 were open and two women were inside.

Clow and Llewellyn knocked on the door, introduced themselves as F.B.I. agents and stated that they believed that the room had been occupied by an individual who was arrested the night before. The women invited them into the room, which, according to Clow and Llewellyn, was

in a state of disarray, indicating to them that the women had not recently arrived. The room may be described as a typical budget motel room, with two double beds, a television set on a stand, several dressers and an open clothes rack, rather than a closet. A bathroom adjoined the sleeping quarters.

Near the television, the agents saw a pile of clothing and two open suitcases on the floor. The larger of the two was black and contained more clothing, while the other case was blue and held toiletries, though it may also have contained clothing. The small case will be referred to as a shaving kit. A woman's nightgown and a western-style shirt were on hangers on the clothes rack, while several cooking utensils had been placed atop the rack. Other unspecified items rested on at least one of the beds.

One of the women stated that her name was Diane Parlette and that she and her husband, Mike, lived in an adjacent room. The other woman identified herself as Carol Hepler and told the agents that she had been living in Room 97 with Posey, who she knew as Jim Santini, for slightly more than a week. Ms. Hepler met Posey at the end of December 1979, presumably in Ohio, where she resided. In January 1980, Ms. Hepler heard that Posey would be in Dallas, although she did not know where he would be staying. She left Ohio, without a jacket, without a suitcase or change of clothes, without money and without toiletry items, and travelled by truck to Texas, where she happened to meet Posey at a truck stop in Mesquite. Posey invited her to share a motel room with him, and so she did.

Ms. Hepler did not contribute to the cost of the room, which was registered under the name of Jim Scorpione, another alias of Posey's. She did not have a key to Room 97, and if she wanted to leave the room, she would ask Mrs. Parlette to wait for her return. Ms. Hepler borrowed the nightgown on the clothes rack from Mrs. Parlette, and she borrowed a shirt from Posey.

Agents Clow and Llewellyn told Ms. Hepler of the reasons for Posey's arrest. Agent Clow remarked that Ms. Hepler was lucky to be alive, though it is not certain whether this comment was made spontaneously or in response to an observation by Ms. Hepler. This information upset her, and she began to whimper, and, at one point, lay down on a bed. Ms. Hepler had discussed marriage with Posey, but they were not engaged. She informed the agents that she had miscarried Posey's child four days before their arrival.

The agents assured Ms. Hepler and Mrs. Parlette, who remained in and around the room during these proceedings, that they were not suspects in any of the crimes for which Posey was arrested, nor were they under arrest. Clow and Llewellyn spent from 15 to 45 minutes attempting

to calm Ms. Hepler. She asked them several questions about the investigation and arrest of Posey. During this conversation, Mr. Parlette entered the room and stated that Posey, using the name "Scorpione," had just called him and requested him to remove the contents from Room 97. Mr. Parlette left Room 97 without taking anything with him.

After they had calmed Ms. Hepler, Agents Clow and Llewellyn presented her with a form to indicate her consent to search the room. They asked if she had been restricted by Posey from entering the suitcases, and she replied in the negative. They told her that she did not have to consent to the search, and requested her to read the form. Ms. Hepler said that she understood the form, and signed it in the presence of the agents, who witnessed it, and Mrs. Parlette. The agents then took account of the items in the room and looked in all drawers, which were empty. Ms. Hepler assisted in this process, and identified the owner of the various goods. Virtually everything in the room belonged to Posey.

At the hearing on the motion to suppress this evidence, Posey testified that although Ms. Hepler had access to the entire motel room, he had forbidden her from entering the suitcases or "any of his things." Ms. Hepler testified that she could enter or use anything in the room except for the shaving kit. However, she admitted that she first saw the contents of the shaving kit on the morning of February 12, before the F.B.I. agents arrived.

No witness at the hearing suggested that the agents made any promises or threats to coerce Ms. Hepler to sign the form. She concluded that her consent was not voluntarily given, because she felt that if she did not cooperate with the F.B.I. agents, they might consider her an accomplice of Posey's.

The trial court found "some question * * * as to whether or not [Ms. Hepler's] consent was not given out of fear and hysteria and under the belief she had to do so or she might be accused as an accomplice." It was concluded from this that the State had failed to prove that Ms. Hepler's consent was voluntarily given. The trial court additionally noted that it was not shown that Carol Hepler had a sufficiently close relationship to the items seized to be able to bind the defendant by her consent to search. The court stated that Ms. Hepler's authority to consent to the search was further undermined by her admission that she was forbidden to open the shaving kit. For these reasons, defendant's motion to suppress the use of this evidence at trial was granted in all respects.

■■ The facts of this case, it should be noted, raise a question of the conflict of laws. The search took place in Texas, while the case is being prosecuted in Illinois. Neither side challenges the application of Illinois' search and seizure standards to this case. Nor is it suggested that Texas' law of search and seizure differs from that of this State, so that the alleged

conflict of laws may be only a "false conflict." Nonetheless, it has been held, in a similar situation, that Illinois' law should apply to the out-of-state search and seizure (*People v. DeMorrow* (1974), 17 Ill. App. 3d 901, 308 N.E.2d 659), and we will follow that ruling in this case.

■■ In order for a warrantless search conducted through third-party consent to pass constitutional muster, the State must first prove by a preponderance of the evidence that that consent was voluntary. (*United States v. Matlock* (1974), 415 U.S. 164, 39 L. Ed. 2d 242, 94 S. Ct. 988; *People v. Bean* (1981), 84 Ill. 2d 64, 417 N.E.2d 608; *People v. Ford* (1980), 83 Ill. App. 3d 57, 403 N.E.2d 512.) The voluntary nature of the consent depends, not on any single criterion, but on all circumstances surrounding the giving of the consent. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041; *People v. Armstrong* (1979), 77 Ill. App. 3d 916, 396 N.E.2d 845, *cert. denied* (1980), 447 U.S. 926, 65 L. Ed. 2d 1120, 100 S. Ct. 3022.

The trial court specifically found that the agents used no force, threats, or promises to coerce Ms. Hepler's consent. Quite to the contrary, Agents Clow and Llewellyn spent considerable time attempting to calm her. They presented her with the consent form and explained it to her, noting that she was not obliged to consent to the search. Ms. Hepler signed the form and assisted in the search and inventory without intimating a desire to withdraw her consent. The trial court ruled that the factors rendering Ms. Hepler's consent involuntary were (1) that she was upset by the news of Posey's arrest, and (2) that she thought that she could not refuse consent without being considered an accomplice.

■■ The precise holding of *Schneckloth v. Bustamonte* was that the State need not prove that the consenting party knew that he could refuse to consent as a prerequisite to a determination that the consent was voluntary. (See also *People v. Billings* (1977), 52 Ill. App. 3d 414, 367 N.E.2d 337.) In reaching that conclusion, Justice Stewart wrote that if a contrary rule would be adopted, "[a]ny defendant who was the subject of a search authorized solely by his consent could effectively frustrate the introduction into evidence of the fruits of that search by simply failing to testify that he in fact knew he could refuse to consent." 412 U.S. 218, 230, 36 L. Ed. 2d 854, 864, 93 S. Ct. 2041, 2049.

■■ Similar considerations compel us to disagree with the trial court in this case. All the objective testimony shows that the F.B.I. agents did nothing to force Ms. Hepler to consent, and that the consent, obtained in Ms. Hepler's motel room in mid-morning in the presence of a friend, was not the product of a coercive atmosphere. (*People v. Johnson* (1975), 28 Ill. App. 3d 799, 329 N.E.2d 464; *People v. Nash* (1975), 27 Ill. App. 3d 462, 326 N.E.2d 462.) However, the trial court found that the consent resulted from Ms. Hepler's "hysteria" and ignorance of her right to refuse consent,

even though the agents acted to reassure her and told her that she need not consent. We do not doubt that Ms. Hepler was disturbed by the course of events that morning. But, her suppression-hearing description of her mental state does not override all the other testimony which proves that her consent was voluntarily given. To invalidate a consent to search on the grounds given by the trial court would open every consent search to attack by claims of emotional distress resulting from contact with law enforcement officials. The trial court's characterization of Carol Hepler's consent to search as involuntary was therefore contrary to the evidence presented at the suppression hearing.

■■ The second prerequisite to a valid consent to search is that the consenting party have the authority to permit inspection of the particular places and items searched. The "common authority" to consent to a search rests "on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock* (1974), 415 U.S. 164, 171 n.7, 39 L. Ed. 2d 242, 250 n.7, 94 S. Ct. 988, 993 n.7; *People v. Stacey* (1974), 58 Ill. 2d 83, 317 N.E.2d 24.

In *White v. United States* (10th Cir. 1971), 444 F.2d 724, investigating authorities discovered that one "Frank Miller" had been seen leaving the scene of a burglary. They went to a room registered in that name at a neighboring motel, where they were told by a "Mrs. Miller" that her husband was out. The motel room was later put under surveillance, and the defendant was seen escaping from the room by a window. He eluded the police, but was later apprehended as he attempted to return to the motel.

During the defendant's absence, "Mrs. Miller" opened the motel room to the authorities, who conducted two separate searches. The first of these was unsuccessful, but during the second search, the officers discovered "a small cloth bag containing, among other things, travelers checks and false identification."

At the hearing on the motion to suppress the use of these items, it was learned that "Mrs. Miller" was not married to the defendant. Her name was Anna Atkinson, but she claimed to be defendant's wife during her travels with him, which covered a period of three years. She had borne one of defendant's children and was eight months pregnant at the time of the search.

The trial court denied defendant's motion for suppression, and the defendant appealed from his conviction. He conceded that Anna Atkinson had the authority to allow the officers to search the room, but argued that she had no authority to consent to their search of his cloth bag. The

Tenth Circuit did not accept defendant's position. The court felt that because Anna Atkinson held herself out as defendant's wife, because she did not object to the search of the bag or remark that it was exclusively defendant's property, and because the defendant left her in complete control of the room during his absence, her authority extended to the bag and its contents.

A similar conclusion was drawn by the Oregon Court of Appeals in *State v. Gordon* (1975), 23 Or. App. 587, 543 P.2d 321. It was reported to the police that several individuals had purchased a white 1967 Chevrolet from an Albany, Oregon, service station, and had paid for it with a fraudulently drawn check. Authorities in Corvallis saw a white 1967 Chevrolet parked in front of a hotel. The defendant told the officers that he had purchased it from a service station in Albany.

The next day, the officers went to defendant's room at the hotel. A Ms. Betty Davis answered the door and told them that she had been living with the defendant for eight months. She gave oral and written consent to the officers to search the room. Several blank checks of evidentiary value were recovered from a suitcase found in a closet. The court of appeals affirmed defendant's conviction based in part on this evidence, because the defendant did not have a reasonable expectation of privacy in the suitcase.

Both *White* and *Gordon* seem to be soundly based on constitutional principles and are therefore persuasive to this court. Many other cases, involving only slight differences from these facts, have also agreed with the conclusions reached in *White* and *Gordon*. (See *United States v. Matlock* (1974), 415 U.S. 164, 39 L. Ed. 2d 242, 94 S. Ct. 988, *dicta*; *Rutledge v. State* (Okla. Crim. App. 1976), 545 P.2d 1257; Annot., 4 A.L.R. 4th 1050 (1981).) However, as these cases are often unique, we must analyze all the components of Ms. Hepler's relationship to the premises or items searched in order to define the scope of her authority to consent. *People v. Logan* (1980), 87 Ill. App. 3d 351, 408 N.E.2d 1086.

Although Ms. Hepler did not have a key to Room 97, nor did she pay for any portion of the rent, it is not disputed that she had unrestricted access to all portions of the room. (Compare *People v. Nunn* (1973), 55 Ill. 2d 344, 304 N.E.2d 81, *cert. denied* (1974), 416 U.S. 904, 40 L. Ed. 2d 108, 94 S. Ct. 1608.) She had lived in the room for slightly more than a week, but during that time, the motel was her exclusive residence in the Dallas area, and all of her possessions which she brought to Texas with her were in that room. (Compare *People v. Rodriquez* (1967), 79 Ill. App. 2d 26, 223 N.E.2d 414, with *People v. Smith* (1969), 108 Ill. App. 2d 172, 246 N.E.2d 689, *cert. denied* (1970), 397 U.S. 1001, 25 L. Ed. 2d 412, 90 S. Ct. 1150.) Both cases were found open on the floor of the room.

Against these unchallenged facts, defendant places his claim at the

suppression hearing that he forbade Ms. Hepler from entering either container and Ms. Hepler's testimony that she was instructed not to open the shaving kit. Even if defendant's admonishments did not lose some credibility with his loan of a shirt to Ms. Hepler, those instructions alone do not warrant suppression of the evidence. The limitations allegedly placed on Ms. Hepler do provide some proof of whether the defendant had an expectation of privacy in either case. However, the pertinent legal question is whether that expectation of privacy was "reasonable," as judged by objective criteria. *People v. Stacey* (1974), 58 Ill. 2d 83, 317 N.E.2d 24; *People v. Logan* (1980), 87 Ill. App. 3d 351, 408 N.E.2d 1086.

■■ We cannot deem defendant's claims of privacy to be reasonable. Where the defendant's girl friend lived with him in the motel room, had no other residence in the area, and was given complete access to all areas of that room, he cannot challenge the scope of her consent to search open suitcases found in plain view on the floor of that room.

As Ms. Hepler's consent to search was voluntarily given and extended to the items taken from the room by the F.B.I. agents, the trial court erred in granting any portion of defendant's motion to suppress. The order appealed from is reversed in its entirety, and the cause is remanded to the Circuit Court of Marion County.

Reversed and remanded.

JONES and HARRISON, JJ., concur.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING
Mr. JUSTICE WELCH delivered the opinion of the court:

■■ In his petition for rehearing, defendant claims that, in making our decision, we have overlooked the arrival of Mr. Parlette in Room 97. He argues that, even if Carol Hepler had sufficient authority over the suitcases to consent to their seizure, (1) defendant did not assume the risk of her exercise of that authority, because his telephone call to Mr. Parlette vested Parlette with the sole authority over the cases, and (2) defendant objected to her consent by sending Mr. Parlette to Room 97 to remove the suitcases. Defendant's latter argument is made for the first time in his petition for rehearing; therefore, it has been waived. Ill. Rev. Stat. 1979, ch. 110A, pars. 341(e)(7), 367(b); *People v. Grant* (1976), 42 Ill. App. 3d 790, 356 N.E.2d 933, *rev'd on other grounds* (1977), 68 Ill. 2d 1, 368 N.E.2d 909.

The principal source of evidence about Mr. Parlette is the testimony of Agent Llewellyn, for the defendant did not mention Mr. Parlette at the

suppression hearing, and Carol Hepler and Agent Clow made only brief references to him. The hearing testimony establishes that Mr. Parlette arrived in Room 97 after the F.B.I. agents arrived, that Carol Hepler signed the consent form after Mr. Parlette's arrival and that Mr. Parlette was not present in Room 97 when the consent form was signed. Agent Llewellyn testified that "[w]hen Mr. Parlette had come into the room he had received a phone call from Mr. Posey. At that time I believe it was Mr. Scorpione I believe was the name used, asking Mr. Parlette to remove the contents out of that room." Llewellyn recalled that he and Clow did not vacate the room and instead secured Carol Hepler's consent to search because he was afraid that Mr. Parlette "would intend to clear out the room." In response to the court's questioning, Llewellyn supposed that he and Clow "could have stopped him" from removing anything. From this testimony, it is a reasonable conclusion that Mr. Parlette left Room 97 before Carol Hepler signed the consent form, and that he did so without taking anything with him.

Turning to defendant's first argument, it is urged that Mr. Parlette's expressed intent to exercise authority over the suitcases is a significant fact in that matrix of objective factors which constitute the circumstances surrounding the consent, and that this fact, in the context of those circumstances, should lead to the conclusion that Carol Hepler did not have sufficient authority over the suitcases to consent to their seizure. It is true, as we have noted above, that the inquiry into the existence of common authority is basically an objective one, and that the defendant's expectations are irrelevant. (*People v. Stacey* (1974), 58 Ill. 2d 83, 317 N.E.2d 24). But, the objective criteria indicate that Carol Hepler's authority over the suitcases was not significantly diluted by Mr. Parlette's expressed desire to remove them.

Carol Hepler was a co-occupant of Room 97, while Mr. Parlette lived next door. She had made use of some of the contents of at least one suitcase, and the other had been opened, perhaps by her, during the morning of the agents' arrival, when the defendant was not in the room. There is no proof that Mr. Parlette had any contact with Room 97 or the suitcases before the agents arrived. His only connection with the premises searched and the items seized was his telephone directive from the defendant. Neither Mrs. Parlette's presence in Room 97 nor her past services in watching the room for Carol Hepler were shown to have expanded her husband's authority over the room or its contents.

■■ When Mr. Parlette's connections with Room 97 and the suitcases are compared with Carol Hepler's ties to the same items, it would be apparent to an outside observer that Carol Hepler possessed superior authority over these items. The risk assumed by defendant of Carol Hepler's consenting to search the room and cases was not significantly

reduced by his phone call to Mr. Parlette. Because the objective facts in this case show that Carol Hepler's access to and use of the premises searched and items seized was much greater than Mr. Parlette's authority over Room 97 and its contents, we must adhere to our view that Carol Hepler's common authority to consent to the search in question was not nullified by Mr. Parlette's attempt to exercise control over the suitcases.

Rehearing denied.

JONES and HARRISON, JJ., concur.