Filed 7/9/10          NO. 4-09-0863

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, )   Appeal from
          Plaintiff-Appellant,      )   Circuit Court of
          v.                        )   Macon County
JOHN E. BELL,                       )   No. 09CF295
          Defendant-Appellee.       )
                                    )   Honorable
                                    )   Timothy J. Steadman,
                                    )   Judge Presiding.
_____

JUSTICE KNECHT delivered the opinion of the court:

In February 2009, the State charged defendant, John E. Bell, with two counts of child pornography (720 ILCS 5/11-20.1(a)(6) (West 2008)) based on images found on his computer's hard drive. In May 2009, defendant filed a motion to suppress physical evidence, arguing the search and seizure of his computer was conducted without lawful authority. Following a November 2009 hearing, the trial court granted defendant's motion.

The State appeals, arguing (1) police had actual and apparent authority to search defendant's computer based on the consent given by defendant's then-girlfriend, (2) the inevitable-discovery exception applies, and (3) probable cause allowed police to seize defendant's computer regardless of whether defendant's girlfriend had authority to consent to the search. We reverse and remand.

I. BACKGROUND

In October 2008, two deputies from the Macon County sheriff's department arrived at defendant's home after defendant's then-girlfriend, Penni Matticks, called 9-1-1 to report she and defendant were involved in a fight. Upon arriving at the residence, the deputies learned Matticks hit defendant. Matticks explained she did so in response to discovering defendant had been searching the Internet for photographs of unclothed, underage girls. The deputies obtained signed consent from Matticks to search the computer located inside the residence, wherein pornographic images were discovered on the computer's hard drive. In February 2009, the State charged defendant by information with two counts of child pornography. In May 2009, defendant filed a motion to suppress physical evidence contending (1) no search or arrest warrant supported the search and subsequent seizure, (2) no exigent circumstances were shown to justify the warrantless search and seizure, (3) defendant never consented to the search or seizure, (4) no other person who possessed common authority over the areas searched consented to the search or seizure, and (5) the search and seizure were not incident to or contemporaneous with a valid arrest of defendant. In November 2009, the trial court held a hearing on defendant's motion, wherein the parties presented the following evidence.

Defendant testified he was the sole owner of the

residence located at 6376 Kitchen Road in Decatur.  No other names appeared on the residence's title, no one else held any ownership interest in the residence, and the residence was not leased to anyone.

In October 2008, Matticks was defendant's girlfriend and had lived with defendant at the Kitchen Road residence since December 2007.  Defendant and Matticks had no specific agreement, such as a lease, regarding Matticks living at the residence. Defendant provided nearly all the housewares and furniture, except for a small bookcase Matticks bought for the laundry room. Defendant estimated Matticks stored 8 to 12 boxes of her packed belongings in the basement.  Although Matticks did not have her own key to the residence, defendant allowed her to use his truck, which contained a garage-door opener Matticks used to enter the house.  Defendant also testified Matticks knew where he kept a key hidden outside "in case [he and Matticks] locked [them]selves out."

Several days prior to the October 20, 2008, incident in which Matticks called 9-1-1, Matticks approached defendant, claiming she found objectionable material on the computer. Defendant and Matticks argued, and defendant removed the computer's keyboard and hid it under the bed "because [defendant] did not want [Matticks] to have any further access to the computer[] and [he] knew it was disabled without the keyboard."

When Matticks asked where the keyboard was, defendant told her he hid it because he "[did not] want [her] using that computer." Defendant testified prior to the removal of the keyboard, Matticks had full use of the computer. Next to the computer, defendant kept a Post-It note listing all passwords attached to accessing the computer, which defendant did not take down when he removed the keyboard.

On October 20, 2008, defendant noticed Matticks's behavior was "aggressive" and "irrational," which led defendant to believe Matticks was drunk. At one point, Matticks made inappropriate comments to two workers repairing the septic tank. To "calm her down," defendant took Matticks out to lunch. While in the car after picking up food, Matticks turned off the radio. Defendant turned it back on, which prompted Matticks to throw an unwrapped cheeseburger in defendant's face. When defendant and Matticks arrived home, Matticks again confronted defendant about the objectionable material on the computer and then hit defendant in the face with her fist. Defendant left the house and returned approximately an hour and a half later, hoping Matticks had "sobered up." As defendant lay on the sofa, Matticks approached him from behind and again struck him with her fist, breaking defendant's glasses. Defendant recalled telling Matticks, "'This is over. I want you out of here tonight,'" to which Matticks responded, "'Okay. That's fine. Bring my stuff up out of the

basement.'"

While defendant moved Matticks's boxes out of the basement, Matticks picked up the hand truck defendant was using to move the heavier boxes and threw it at defendant, hitting defendant and knocking him to the ground. Matticks informed him she was calling 9-1-1. Defendant did not object to calling the police but asked Matticks not to use the cellular phone issued to defendant by his employer. When Matticks refused, defendant grabbed the phone and handed her his personal cellular phone. In the 45 minutes between Matticks's 9-1-1 call and the police's arrival, defendant moved all of Matticks's boxes out of the basement and stacked them inside the front door.

When the police arrived, they entered through the front door, near where defendant had stacked Matticks's boxes. The two officers separated defendant and Matticks and conducted interviews of each in different rooms. At one point, the officer interviewing defendant left to speak with the other and with Matticks. Upon returning to defendant, the officer asked, "'Tell me about the kiddie porn that's on your computer.'" Defendant replied, "'I don't know what you're talking about.'" The officer handcuffed defendant and moved him into the backseat of a squad car. For approximately 15 minutes, defendant remained alone in the car, neither speaking with nor seeing either deputy or Matticks. Eventually, one officer drove defendant to the police

station.

On October 21, 2008, defendant's mother bailed him out of jail. Defendant spent the night at his mother's house. When defendant returned home the next day, October 22, 2008, he discovered Matticks and her adult son inside his house. Matticks told defendant she "'got [in] through the kitchen window.'" Defendant observed the blinds on the window were pulled up and the screen had been removed from the outside and propped against the front of the house. Shortly after defendant arrived home, Matticks and her son removed her things from defendant's house and never returned. After Matticks left, defendant went into his office and noticed his computer was missing.

Shirley Bell, defendant's mother, briefly testified she bailed defendant out of jail on October 21, 2008, and accompanied him to his house the following day. At defendant's house, she saw Matticks. Matticks told Bell she entered the house through the window. Bell had not seen Matticks at defendant's house since October 22, 2008.

Matticks testified she and defendant dated when they were younger. Years later, they reconnected, and in "a matter of weeks" she and defendant "spoke of marriage" and began living together. Matticks did not recall if she had a key to the residence and instead "came and went through the garage," using "the garage door clicker." She did not pay defendant rent but

gave him $7,200 to put toward his mortgage on the residence, which defendant returned in full to Matticks "when [she] left," "after [she and defendant] broke up."

On October 17, 2008, Matticks awoke in the middle of the night to find defendant missing from the bed. She noticed light coming from underneath the door to the spare bedroom, which she and defendant used as an office. Matticks opened the door and discovered defendant using his computer. Upon seeing Matticks, defendant immediately clicked off the computer's browsing screen, something Matticks "had never seen him do." Although defendant told Matticks he had been checking his e-mail, Matticks "[felt] like he was doing something that he knew would upset [her]." She checked the computer's browsing history after defendant left for work the next morning. The browsing history revealed defendant conducted a Google search in the previous 12 hours using the words "slim," "teen," "girls," and "porn" and then proceeded to several of the resulting links, "indicating he had completed the search *** and visited those links." Matticks clicked one link in the browsing history, which revealed "images of what looked to be young [naked] girls in really *** lewd positions." At that point, Matticks "wanted to talk [to defendant] and get to the bottom of this" but had no immediate plans to break off her relationship with defendant or move out of his house.

The following day, Matticks confronted defendant. Defendant did not tell Matticks she could no longer use the computer, and Matticks could not recall whether defendant removed and hid the computer's keyboard because she had not used it since before confronting defendant about the images she found in the computer's browsing history.

On October 20, 2008, Matticks grew "aggravated" with defendant because she had to deal with a malfunctioning sump pump while defendant "was laying on the couch watching television." Contrary to defendant's testimony, Matticks claimed she was not inebriated and never made rude or confrontational statements to the workers present at the house to fix the sump pump. She further denied throwing a cheeseburger at defendant when they went out to lunch but admitted she and defendant fought about the radio station during the drive home. Upon arriving home, Matticks again confronted defendant about what she found on his computer. Defendant was "defensive" and denied any wrongdoing. Later in the day, the argument resumed and grew "ugly," culminating with Matticks slapping defendant across the face. At that point, Matticks had consumed approximately three alcoholic beverages containing bourbon and Pepsi, but she denied being drunk. After Matticks slapped defendant, he went to the basement and started carrying up Matticks's things, telling her "if [she] didn't like what he did, [she] could get out." However, Matticks

denied defendant telling her he wanted her out of the house that night. Matticks eventually called 9-1-1 because defendant "became very angry," "shoved [Matticks] around a little," and "tried to tie [her] up with a rope on his kitchen floor."

When police arrived, one officer asked Matticks why she slapped defendant. Matticks told him she found lewd images on defendant's computer and pointed out its location in the spare bedroom. The police placed defendant and Matticks under arrest and seated them in separate squad cars. While backing down the driveway, the officer driving the car carrying Matticks received instructions via radio to return to the house and confiscate defendant's computer. The officer asked Matticks for permission to remove and search the computer. Matticks "told him it was fine" and signed her written consent, which the State admitted into evidence as People's exhibit No. 1.

Matticks spent the night in jail and was released the following day. Matticks "immediately" went to defendant's house and found it locked. Since the spare key defendant kept hidden on the property unlocked only one of the two locks on the house's only door, Matticks entered through the kitchen window, which she knew defendant kept unlocked in case he locked himself out of the house. After leaving defendant's house, Matticks never returned because she "wasn't welcome to."

Detective George Harris of the Macon County sheriff's

department testified he was dispatched along with Deputy Choatie, a backup deputy, to defendant's residence on October 20, 2008, in response to a "domestic situation." Detective Harris and Deputy Choatie arrived simultaneously in separate vehicles. Harris interviewed defendant in the living room, and Choatie interviewed Matticks in a bedroom. Defendant told Harris (1) Matticks was his girlfriend; (2) she had lived in his house for 10 months; and (3) he wanted her to move out, although defendant did not specify whether he had already thrown Matticks out of his home. Defendant also complained to Harris about Matticks acting physically violent toward him.

After his interview with defendant, Harris spoke to Matticks, who told him about allegedly inappropriate images she saw on defendant's computer. Harris smelled alcohol on Matticks but stated she did not appear intoxicated. Harris placed both defendant and Matticks under arrest, and he and Choatie transported each separately to the police station. As Harris backed out of defendant's driveway, Harris received instructions to confiscate defendant's computer. At that point, Harris left defendant in his squad car and approached the vehicle driven by Choatie and containing Matticks. Harris asked Choatie "to ask [Matticks] since she resided at the house [if she] would *** give permission *** to remove the computer tower." Choatie obtained Matticks's consent and removed the computer. No one requested

- 10 -

defendant's permission or informed him Matticks consented to a search of his property.

On cross-examination, Harris admitted Matticks told him defendant informed her to "'get the f--k out'" and tried to throw her out of the house. Harris further admitted seeing boxes stacked near the front door. He (1) denied knowing defendant was in the process of removing the boxes from his home, (2) denied knowing who owned the home, (3) denied knowing whether Matticks possessed a key or paid rent, and (4) stated the extent of his knowledge was Matticks's status as defendant's live-in girlfriend of 10 months. Harris spoke again with Matticks at the police station, where she informed him (1) defendant removed the computer's keyboard, (2) defendant hid the keyboard under the bed, and (3) she had asked defendant to remove her belongings from his residence.

Deputy Todd Choatie, a patrol deputy with the Macon County sheriff's department, testified he arrived at defendant's residence on October 20, 2008, in reference to a domestic complaint. At the residence, defendant greeted Choatie and Harris and invited them inside. Choatie noticed boxes stacked up near the front door, and at some point in the evening, defendant told either Choatie or Harris the boxes belonged to Matticks and had recently been packed up and taken from the basement. Choatie understood "[defendant] was asking [Matticks] to leave."

- 11 -

Choatie interviewed Matticks while Harris spoke with defendant. Choatie described Matticks as intoxicated but in control of her locomotion and attentive in her responses to his questions. When Matticks informed Choatie she had seen child pornography on defendant's computer, Choatie relayed the information to Harris. Based on Matticks's statements, Choatie believed she and defendant had rights to the computer. Harris, the senior deputy, decided to place both defendant and Matticks under arrest for domestic battery. At the instruction of the police command officer, Choatie obtained Matticks's signed consent to search.

Matticks told Choatie the location of the computer and the keyboard. Choatie removed the computer's tower and took it to the Macon County sheriff's office rather than leave it at the residence "[b]ecause of the potential for *** the contents of it to be destroyed." On cross-examination, Choatie admitted knowing individuals like defendant arrested for domestic battery had to go before a judge to have their bail set.

At the close of evidence, the trial court took the matter under advisement. On November 12, 2009, the court entered a memorandum order finding Matticks had neither actual nor apparent authority to consent to a search of defendant's residence. As to actual authority, the court reasoned Matticks did not possess equal rights to the use or occupation of the

residence under United States v. Matlock, 415 U.S. 164, 39 L. Ed. 2d 242, 94 S. Ct. 988 (1974).  In support of its ruling Matticks did not possess apparent authority over the premises, the court stated as follows:

> "The evidence shows that the [s]heriff's deputies were in possession of the following information at the time consent to search was given: [(]1) there was a complaint of domestic violence, [(]2) Ms. Matticks had resided at the location for approximately 10 months, [(]3) defendant stated he wanted Ms. Matticks to move out, [(]4) Ms. Matticks stated the defendant had told her to vacate the residence and tried to throw her out, and [(]5) boxes were observed to be stacked near the basement stairwell and/or the front entrance.  Deputy Choatie testified that Ms. Matticks advised him that both she and the defendant were allowed to use the computer, however, this information is not mentioned in his report.  Under Illinois v. Rodriguez, 497 U.S. 177[, 111 L. Ed. 2d 148, 110 S. Ct. 2793 (1990),] the question to be resolved is whether these facts would warrant a man of

reasonable caution to believe that Ms.
Matticks had authority over the premises.
The court finds the State has not met its
burden to demonstrate apparent authority. At
best, the foregoing information would lead a
reasonable person to make further inquiry
regarding the facts and circumstances
relating to ownership and possession of the
residence and its contents before failing to
secure a search warrant and, instead, seeking
consent to search. *** [A]pparent authority
does not allow a police officer to proceed
without inquiry in ambiguous circumstances or
to accept at face value the consenting
party's apparent assumption that she has
authority to consent to a search."

Accordingly, the court held police illegally seized defendant's
computer and thus the exclusionary rule dictates the evidence
recovered from the search of the computer must be suppressed.

This appeal followed.

## II. ANALYSIS

On appeal, the State argues (1) the trial court erred
in finding Matticks did not possess actual or apparent authority
to consent to the search of defendant's computer, (2) the

evidence discovered as a result of Matticks's consent to search was admissible under the inevitable-discovery exception, and (3) police had probable cause to search defendant's computer regardless of whether Matticks had authority to consent to a search.  We find Matticks possessed actual authority to consent.

The State maintains the trial court erred in finding Matticks did not possess actual or apparent authority to consent to the search of defendant's computer because Matticks had not yet vacated the residence.

A reviewing court accords great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence.  People v. Hopkins, 235 Ill. 2d 453, 471, 922 N.E.2d 1042, 1052 (2009).  However, an appellate court reviews de novo the trial court's ultimate ruling on a motion to suppress.  Hopkins, 235 Ill. 2d at 471, 922 N.E.2d at 1052.

Generally, police are prohibited from warrantless searches.  U.S. Const., amend. IV;  Ill. Const. 1970, art. I, §6.  However, a warrantless search of property is valid when conducted after obtaining voluntarily given consent from either the property owner or a third party possessing common authority over the premises.  People v. Parker, 386 Ill. App. 3d 40, 44, 898 N.E.2d 1047, 1050 (2007).

The State argues Matticks had actual authority to

consent to a search of the residence because Matticks had not yet moved out the residence when she provided police with her signed consent.

Actual common authority is not dependent on the laws of property, such as whether a third party has a lease or shares ownership of the property. People v. Pitman, 211 Ill. 2d 502, 524, 813 N.E.2d 93, 107 (2004). Instead, the Supreme Court has defined actual authority as "mutual use of the property by [third parties] generally having joint access or control for most purposes." Matlock, 415 U.S. at 171 n.7, 39 L. Ed. 2d at 250 n.7, 94 S. Ct. at 993 n.7. "The third party's degree of authority and control over the residence cannot be substantially inferior to that degree possessed by the defendant, and the third party's right to occupy and use the residence must equal or exceed the defendant's right of occupation." People v. Pickens, 275 Ill. App. 3d 108, 112, 655 N.E.2d 1206, 1209 (1995). Common authority exists in situations involving family, marital, or cohabitant relationships. Pickens, 275 Ill. App. 3d at 112, 655 N.E.2d at 1209.

In the case at bar, the parties do not dispute Matticks cohabitated with defendant for 10 months prior to October 20, 2008, when Matticks consented to a search of defendant's computer. Rather, they disagree whether Matticks and defendant ceased cohabitating during their October 20, 2008, disagreement.

- 16 -

The State argues Matticks had actual common authority over the residence the evening of October 20, 2008, because "at the time [Matticks] gave her consent, the living arrangements had not changed." Defendant counters Matticks's actual authority ended when defendant told Matticks to leave his house that afternoon and moved the already-packed boxes Matticks stored in the basement to the front entryway.

Although defendant argues Matticks and defendant no longer lived together the moment defendant told Matticks to get out of his house, Matticks had not yet vacated the residence when she consented to a search of the property several hours later and still resided in the dwelling as her exclusive residence. Defendant places great emphasis on the fact he moved 8 to 12 boxes containing Matticks's packed belongings from the basement to the front entryway. However, Matticks never left the house between the time defendant told her to get out and the police's arrival that evening nor did she make arrangements for removing herself or her belongings from the residence. Moreover, neither Matticks nor defendant testified Matticks packed up her personal items she used daily--such as her clothing or toiletries--which would indicate she was in the process of immediately and permanently vacating the residence. Testimony at the hearing on defendant's motion to suppress also indicated Matticks gave defendant $7,200 to put toward his mortgage. Matticks testified

defendant reimbursed her that amount "when [she] left," "after [she and defendant] broke up." These facts suggest Matticks possessed joint access and control of the residence the evening of October 20, 2008.

In support of his argument Matticks did not have actual authority, defendant cites Rodriguez, 497 U.S. 177, 111 L. Ed. 2d 148, 110 S. Ct. 2793. In Rodriguez, the defendant's girlfriend previously lived with him but had moved out a month prior to giving police consent to search the defendant's residence. Despite the fact the girlfriend had left furniture and household items at the defendant's home and occasionally spent the night at the residence after moving out, the Supreme Court held the girlfriend lacked actual authority. Rodriguez, 497 U.S. at 181-82, 111 L. Ed. 2d at 157, 110 S. Ct. at 2797-98. The Court reasoned the girlfriend did not have joint access to or control of the premises, citing the fact she did not visit the residence when the defendant was not present, contribute rent, or invite her friends over. Rodriguez, 497 U.S. at 181, 111 L. Ed. 2d at 157, 110 S. Ct. at 2798. Unlike the scenario in Rodriguez, Matticks had not yet vacated the residence. Contrary to defendant's assertion he "moved all of Matticks'[s] belongings to the front doorway," testimony from defendant and Matticks establishes the boxes contained items Matticks did not use on a daily basis and her clothing, toiletries, and other necessities

- 18 -

remained unpacked in other areas of the home.

Defendant further argues Matticks lacked actual authority because she did not have a key to the residence. However, possession of a key is not automatically indicative of mutual use or joint access of property for purposes of actual common authority. See People v. Keith M., 255 Ill. App. 3d 1071, 1083-84, 625 N.E.2d 980, 988 (1993) (housekeeper did not have common authority over residence simply because she possessed a key); People v. Posey, 99 Ill. App. 3d 943, 950, 426 N.E.2d 209, 214 (1981) (girlfriend living with the defendant in a motel room had actual common authority over the room despite not possessing a key). Both defendant and Matticks testified Matticks never needed a key in the 10 months she resided with defendant because (1) she drove defendant's truck, which contained a garage-door opener; (2) a spare key was located on the property in case either defendant or Matticks became locked out of the house; and (3) the kitchen window was also left unlocked in case of a lockout.

Additionally, defendant contends even if Matticks had actual common authority over the premises, she did not have authority over the computer because defendant told Matticks not to use it and rendered it inoperable by removing its keyboard earlier in the week. In response, the State cites Posey, 99 Ill. App. 3d 943, 426 N.E.2d 209. In Posey, the Second District

- 19 -

reversed the trial court's grant of a motion to suppress evidence recovered in a suitcase in the defendant's motel room. Posey, 99 Ill. App. 3d at 950, 426 N.E.2d at 214. The Second District reasoned despite the defendant telling his girlfriend she was not allowed to open his bag and not giving the girlfriend a key to the motel room, other evidence supported apparent authority-- namely, the defendant's girlfriend lived with him in the motel room, had no other residence in the area, and was given complete access to all areas of that room. Posey, 99 Ill. App. 3d at 949- 50, 426 N.E.2d at 214.

In this case, testimony at the hearing on defendant's motion to suppress conflicted as to whether Matticks knew defendant had removed the keyboard from the computer and told her she was no longer allowed to use it. However, even assuming Matticks knew defendant no longer wanted her to use the computer, Matticks, like the defendant's girlfriend in Posey, had unrestricted access to the entire residence. As such, this access included the office containing the computer, which still had a Post-It containing its passwords attached and was otherwise operable despite lacking a keyboard.

The above establishes, assuming arguendo defendant told Matticks to leave the afternoon of October 20, 2008, she had not yet vacated the residence several hours later when she consented to a search of the computer contained therein and thus retained

actual authority over the premises.

Here, Matticks had actual authority before defendant told her to leave. That authority continued to exist during the transitional phase of moving out. Defendant's words alone, in these factual circumstances, were not sufficient to rescind her authority. Up to that point, Matticks possessed "joint access or control for most purposes" (Matlock, 415 U.S. at 171 n.7, 39 L. Ed. 2d at 250 n.7, 94 S. Ct. at 993 n.7), and while the process of her moving out was ongoing, her actual authority continued.

Accordingly, the trial court erred in granting defendant's motion to suppress evidence, and we reverse and remand for further proceedings. Because we find Matticks possessed actual authority over the residence, we need not address the State's arguments pertaining to apparent authority, the inevitable-discovery exception, and probable cause.

### III. CONCLUSION

For the forgoing reasons, we reverse the trial court's judgment and remand for further proceedings.

Reversed and remanded.

MYERSCOUGH, P.J., and STEIGMANN, J., concur.