THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MICHAEL BELCHER, Defendant-Appellant.

First District (1st Division)　No. 79-1118

Opinion filed December 29, 1980.

238

Lamont Cranston Strong, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, James S. Veldman, and Adrienne Nobel Nacev, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Michael Belcher, was found guilty in a bench trial of armed robbery, rape and deviate sexual assault and sentenced to a term of 8 to 15 years. He appeals, contending (1) he was not found guilty beyond a reasonable doubt; (2) the trial court improperly admitted hearsay testimony; (3) he was denied effective assistance of counsel; and (4) his sentence was excessive.

The complaining witness testified that on November 16, 1977, she finished work at the Gas USA station on 101st and Halsted at 12:30 a.m. She then walked up Halsted toward 95th Street to catch a bus home. When she reached 96th Street, a Cadillac made a U-turn, pulled up and blocked her path. There were two "boys" in the car. The passenger got out of the car with a gun in his hand, grabbed her arm and told her to get into the back seat of the car. After she got into the Cadillac, the driver, whom she identified in open court as defendant, took off and drove around for a few minutes. The passenger kept the gun pointing at her. The car stopped behind a building near railroad tracks. Defendant then asked her if she had any money. She had $16 with her. Defendant took her handbag and threw it on the front seat of the car.

Complainant further testified that defendant got into the back seat with her, while the passenger bent over the front seat and pointed the gun at her. Defendant ordered her to take off her coat. He took off her

sweater and shirt, tearing the latter. Defendant ordered her to pull down her pants and he pulled down his.

She testified that defendant then told her to "give him some head." She did what defendant told her to do; she put her mouth on defendant's penis. Defendant then lay on top of her and put his penis in her vagina. The passenger in the front seat was still holding the gun and pointing it at her.

Defendant then got up, got out of the car, pulled up his pants and got into the front seat. The passenger gave defendant the gun, jumped over the back of the front seat into the rear seat, took down his pants and put his penis in her vagina, with defendant holding the gun in his hand and leaning over the seat back. The passenger then told her to put her mouth on his penis. She did what he said. She cried the whole time.

Defendant told the passenger to get up and let her put her clothes on. Defendant started the car, backed out and went down the street, stopping after a block or two. The complaining witness did not know where she was. Defendant told her to get out of the car, to walk with her face toward a fence and not to turn around. The passenger asked defendant if he was going to shoot the gun. Prior to getting out of the car, she heard the passenger say to defendant, "Don't go around 90th and Morgan."

Just before or just after she got out of defendant's car, she heard another car pull up. When she left defendant's car, she had her shirt in her hand. Her sweater and her handbag were left in defendant's car. She walked toward the fence and then turned toward the car that pulled up. Defendant's car pulled off. There were three men in the car that pulled up. One of the men got out and asked her what was the matter. She told him she had been raped. She was crying and had been crying "all the time." The man then got back in the car and chased defendant's car. Complainant walked toward 87th Street with another passenger from the car which had pulled up as defendant drove away. They stopped a police car and had a conversation with the police. She then went to 90th and Morgan with the police, where she saw defendant Belcher's car and pointed it out to the police. She was then taken in a squad car to the Little Company of Mary Hospital and then, after being examined there, she went to the police station where she identified her sweater. Her purse was never recovered. She then went to another police station. There she identified defendant in a lineup. He was not wearing the same clothes as at the time of the rape.

On cross-examination, complainant testified that she never tried to run away "because he had a gun." She didn't scream or holler; just cried. The only thing she said was "not to hurt me." She said that she told the police that when she saw the person who got out of defendant's car he had the gun in a holster and it remained there. She also testified that the

conversation concerning 90th and Morgan occurred while driving on Halsted Street before she had intercourse with defendant. She further testified that when they first went to court at 26th and California defendant's mother offered her $1000 to drop the case.

Riley Tubbs testified that he was a passenger in a car in the vicinity of 88th and Normal sometime after 1 a.m. on November 16, 1977. As the car in which he was riding turned the corner of 88th and Normal, he saw a car parked at 88th and Parnell. He could tell from its lights that it was a Cadillac. As the car he was in pulled up, the Cadillac pulled away. He saw a girl "sitting" on the ground with her clothes half off. There was a fence nearby. The girl was "standing" there crying and hollering she had been raped.

On cross-examination, he testified that he saw a car which he recognized as a Cadillac from a distance, although he was not close enough to see its year, color or interior. He further testified that he "seen a glimpse of" the car. He also testified that two of his friends got out of the car in which he was riding, while he stayed in the car, rode to 87th Street to find a police car, and met a police car.

Police Officers Kripner and McNally were involved in the investigation. Officer Kripner testified that some time after 1 a.m. on November 16, 1977, he saw defendant's 1970 Cadillac parked at about 9014-9016 South Morgan. He saw a red sweater in the back seat of the car. He took the sweater to the police station after defendant's arrest.

Officer McNally saw defendant at the police station. He gave defendant his Miranda warnings, which defendant said he understood. McNally asked defendant if he wanted to speak and defendant said he did. McNally showed defendant the sweater which had been found in defendant's car. Defendant said it belonged to his girlfriend, Janice Jones, and that he had been at his girlfriend's home from 6:30 p.m. on November 15, 1977, until he was arrested on November 16, 1977.

Defendant testified that at about midnight on November 15, 1977, he was driving his Cadillac northbound on Halsted with his friend, Maurice Jones. He drove into the Gas USA station at 101st and Halsted and saw a young woman he identified as complainant. She walked over to his car, said she was just finishing work and asked defendant where he was going. Defendant told her he was going to 90th and Morgan and she then asked for a ride. She got her sweater, made a telephone call and got into the back seat of the car. They exchanged names. She agreed to share a pint of gin with defendant and his friend and to go park. They parked in a secluded area behind a factory on 90th and Eggleston for 15 to 20 minutes. Complainant agreed to have sex with both men. Defendant had both oral sex and sexual intercourse with her. Defendant's friend was in the back seat with her for 10 minutes, while defendant was in the front

seat drinking. Complainant did not ask for money in exchange for the sexual acts.

Defendant testified that complainant asked him to drop his friend off and to spend the night with her alone. His friend did not like that and began threatening her because she did not want to be with him. She became scared and asked to be dropped off. Defendant told her that he was going to 90th and Morgan to drop off his friend and to see his girlfriend. Complainant, defendant testified, was not upset when she left his car.

Defendant testified that he returned to his girlfriend's house after he had intercourse with complainant and stayed there for three to four hours before he returned to his car and was arrested at 90th and Morgan. He spoke to a police officer, who advised him of his rights. He told the officer he did not rape complainant, that he had been at his girlfriend's house since 6:30 p.m. on November 15, 1977, and that the sweater found in the car belonged to his girlfriend; he thought the sweater belonged to his girlfriend. He further testified that he had said he was with his girlfriend because he was afraid. He had never been in trouble before.

Ray Reilly testified that he owned the Gas USA station at 101st and Halsted on November 16, 1977, and that complainant never worked for him. He knew her because in 1976 or 1977 she was "going" with his son, who worked at the station, and she was around there every day to be with him. Reilly did not like his son's and her behavior and took the gas station keys away from them around October of 1977.

It was stipulated that if Dr. Lowry were called to testify he would testify that on November 16, 1977, he examined complainant and that he took slides; spermatazoa were present.

■■ Defendant contends that he was not proved guilty beyond a reasonable doubt. We disagree. "The evaluation of the credibility of witnesses, the determination of the weight to give testimony and the inferences to draw from testimony is a function of the trier of fact." (*People v. Padilla* (1979), 70 Ill. App. 3d 406, 412, 387 N.E.2d 985, *appeal denied* (1979), 79 Ill. 2d 616, *cert. denied* (1980), 445 U.S. 961, 64 L. Ed. 2d 235, 100 S. Ct. 1646.) Complainant's testimony, although it contains some minor discrepancies and was directly contradicted by defendant, was clear and convincing. The trial court heard and saw complainant, defendant and the other witnesses and passed on their credibility and the weight to be given their testimony. We have carefully reviewed all of the evidence and find that there is no reasonable doubt of defendant's guilt. (See *People v. Secret* (1978), 72 Ill. 2d 371, 376-77, 381 N.E.2d 285.) The testimony here is clear and convincing and is also corroborated by the testimony of Tubbs, by complainant's sweater in defendant's car and by the doctor's stipulated testimony.

Defendant contends the testimony of Riley Tubbs that complainant had stated she had been raped was hearsay and its admission constituted reversible error. We disagree.

■■ Complainant's statement was a spontaneous declaration. It took place within a very short time after the occurrence. She stated that when asked "what was the matter," she told one of the men who drove up in the car that she had been raped. Tubbs testified that she was "hollering she had been raped." Her testimony concerning her statement was not hearsay: she was present and subject to cross-examination. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738.) It was also admissible as a prompt complaint to corroborate her testimony of the rape. (*People v. Davis* (1957), 10 Ill. 2d 430, 140 N.E.2d 675.) Tubbs' testimony was clearly admissible both as a spontaneous declaration of complainant and as corroborative of her testimony. (See *People v. Parisie* (1972), 5 Ill. App. 3d 1009, 287 N.E.2d 310, *appeal denied* (1972), 52 Ill. 2d 596; *People v. Vinson* (1977), 49 Ill. App. 3d 602, 364 N.E.2d 364.) Nor did asking complainant "what was the matter" destroy the spontaneity of her response. *People v. Cherry* (1980), 88 Ill. App. 3d 1048, 411 N.E.2d 61; *People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25; *People v. Leyva* (1977), 47 Ill. App. 3d 53, 361 N.E.2d 763.

Defendant argues that the record shows that not one, but two, cars drove up successively, that Tubbs did not see defendant's car drive away and that therefore it was possible that enough time elapsed to allow complainant to fabricate her testimony. From our examination of the record, we do not agree that there were two cars or that Tubbs did not see defendant's car. Indeed, this claim of two cars was not made in the trial court and was only made for the first time in this court in defendant's reply brief. We do not find that it has substance. But even if there was a lapse of time between complainant's leaving defendant's car and her complaint when the car in which Tubbs and others were riding, the evidence is clear that it was a very short period. The mere lapse of a short period of time does not in itself make the testimony objected to inadmissible. *People v. Kilgore* (1976), 39 Ill. App. 3d 1000, 350 N.E.2d 810; *In re Hatfield* (1979), 72 Ill. App. 3d 249, 390 N.E.2d 453; *People v. Osborn* (1977), 53 Ill. App. 3d 312, 324, 368 N.E.2d 608, *appeal denied* (1978), 71 Ill. 2d 600, *cert. denied* (1978), 439 U.S. 837, 58 L. Ed. 2d 134, 99 S. Ct. 122.

Defendant argues that he was denied effective assistance of counsel. We disagree. Competency is to be determined from the totality of counsel's conduct at trial. A defendant is entitled to a new trial only if his representation was a nullity, reduced the proceedings to a farce or a sham and produced substantial prejudice to the defendant without which the result of the trial would probably have been different. (*People v. Murphy*

(1978), 72 Ill. 2d 421, 381 N.E.2d 677; *People v. Hills* (1980), 78 Ill. 2d 500, 401 N.E.2d 523; *People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203.) Defendant's request that the Federal standard of "some minimum standard of professional representation" be adopted as the standard in Illinois was considered and rejected by the Illinois Supreme Court and that rejection reaffirmed in *People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203.

■■ The record shows that defense counsel vigorously cross-examined complainant, Tubbs and the other witness to bring out inconsistencies, objected to Tubbs' testimony as hearsay and called the owner of the gas station to testify that complainant did not work there. Counsel's failure to try to impeach complainant's testimony that she was coming from the gas station with her grand jury testimony that she was on her way home from the "L" station had no substantial bearing on details of the rape. It did not show incompetence of counsel. A defendant is entitled to "competent, not perfect or successful, representation." *People v. Murphy* (1978), 72 Ill. 2d 421, 438, 381 N.E.2d 677.

Defendant's final contention is that the sentence imposed was excessive. We disagree. Under article 1, section 11 of the 1970 Illinois Constitution "all penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." This requires balancing between the interest of protecting society and the possibility of rehabilitation of the offender. The imposition of a sentence is a matter of judicial discretion. Absent an abuse of that discretion, a reviewing court will not alter the sentence imposed. *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541, reaffirming *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

■■ The trial court observed defendant during the trial, heard the evidence against him, considered the nature of the rape, defendant's testimony and the presentence report, which showed no previous criminal record. Defendant elected to be sentenced under the old code. We cannot say that the trial court, in balancing these factors, abused its discretion in imposing the sentence.

■■ Defendant further asks that, if his conviction is not reversed or remanded for a new trial, he be granted probation by this court. This we cannot do. (*People v. Rege* (1976), 64 Ill. 2d 473, 481-82, 356 N.E.2d 537.) Further, probation is not available in a conviction for rape. Ill. Rev. Stat. 1975, ch. 38, par. 1005—5—3(d).

The convictions and sentence are affirmed.

Affirmed.

GOLDBERG, P. J., and CAMPBELL, J., concur.