THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* PAUL BRYANT, Defendant-Appellant.

First District (4th Division)    No. 80-3219

Opinion filed March 25, 1982.

James J. Doherty, Public Defender, of Chicago (Judith A. Stewart, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Lester M. Joseph, and Denise Porn, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

Defendant, Paul Bryant, was indicted for murder (Ill. Rev. Stat. 1975, ch. 38, par. 9—1) and burglary (Ill. Rev. Stat. 1975, ch. 38, par. 19—1). After a jury trial, he was found guilty of both offenses and sentenced to 6 2/3 to 20 years for burglary and 500 to 1500 years for murder, the sentences to be served consecutively. Defendant raises the following issues on appeal: (1) whether the delay in taking him before a judge on approved charges at the first scheduled court date contributed to an involuntary confession; (2) whether the trial court's rulings on the use of prior convictions to impeach him and his offer of proof deprived him of his constitutional right to present a defense, and whether this combination of errors requires reversal; and (3) whether his sentence for murder was excessive and vindictive.

We affirm.

Testimony at the hearing to suppress statements made by defendant established the following.

James Jones, James Biebel and Michael Atkins, investigators for the Chicago police department, arrested defendant Bryant on August 9, 1979, at about 5:15 a.m. in the area of 535 West Addison Street, in Chicago.

Jones advised defendant of his right to remain silent. Defendant was driven to an address on North Pine Grove where he was identified by a rape victim as her assailant.

Defendant was then taken to police headquarters. While in the police car, Jones gave defendant *Miranda* warnings by reading from a pre-printed card. After reading each right, Jones asked defendant whether he understood the right, and defendant said that he did. Defendant was taken to an interview room and handcuffed to a security hook on the wall. Jones and Biebel talked with defendant for approximately 2 hours.

At about 9 a.m., one of the policemen contacted the State's Attorney's felony review section. At 10 a.m., an assistant State's Attorney, Michael Robbins, came to the station and advised defendant of his constitutional rights. Robbins did not observe any physical injuries on defendant nor did he observe anyone strike, abuse, make a promise to, or threaten defendant. When asked by Robbins whether anyone had threatened or mistreated him, defendant said no one had.

Between 11 a.m. and 1:30 p.m., defendant was placed in several lineups. That afternoon from 2:30 to 4:30, Jones and Biebel talked with defendant. At 5 p.m., Jones, Biebel and Atkins took defendant to a restaurant for dinner. They also drove defendant to places, which he wanted to point out to them, where he had committed other crimes. The officers returned defendant to the interview room about 8 p.m. when he was allowed to see his stepfather and other members of his family. At 10:30 p.m., defendant was taken to the lockup.

At 12:30 p.m. on August 10, 1979, defendant was returned to the interview room. Jones gave defendant *Miranda* warnings, reading from a preprinted card. Officers Jónes and Biebel talked with defendant for about 2 hours. At 5:30 p.m., defendant was introduced to homicide investigators John Philbin and Thomas Stevens. Philbin read *Miranda* warnings to defendant. The officers' conversation with defendant lasted approximately 1½ hours after which the officers left to eat. When they returned around 8 p.m., they brought food for defendant. Members of defendant's family again visited with him for 2 hours.

At 10 p.m., defendant stated that he wished to continue to tell the police about the crimes he had committed. Defendant was taken to two addresses on North Kenmore and then returned to the interview room where he was again advised of his constitutional rights. Defendant said that he was still willing to talk. Investigator Philbin called the felony review section of the State's Attorney's office and Nicholas Faklis, an assistant State's Attorney, came to police headquarters. At about 1 a.m. on August 11, 1979, Faklis gave *Miranda* warnings to defendant and summoned a court reporter. In the presence of the court reporter, Investigators Jones and Philbin, and assistant State's Attorney Faklis, defendant

made two statements. Before each statement, defendant was given *Miranda* warnings. Defendant read each statement and signed them.

The police officers testified that they did not see anyone strike defendant nor did they themselves strike him. No threats, promises or misrepresentations were made to defendant, and there was no mention made of psychiatrists. Faklis testified that he observed no mistreatment, heard no promises, threats or mention of psychiatrists.

A police report indicated that defendant was scheduled to go to court on August 10, 1979, at 11 a.m. but that the police put a "hold" on defendant because he had informed them of numerous serious crimes he had committed. During the evening of August 9, accompanied by policemen, defendant pointed out places where he had committed those crimes.

At the hearing, defendant said that on the way to the police station he was told to keep his mouth shut. He did not remember seeing assistant State's Attorney Robbins on the morning of August 9. He saw his stepfather for 30 minutes and told him he wanted a lawyer. Later, defendant also saw his girlfriend and their son. When defendant was taken back to the interview room after appearing in lineups, Officer Biebel came in with a folder containing photographs of a dead person. Biebel said that sooner or later defendant would have to tell the truth and that defendant would get psychiatric help if he cooperated. Defendant was told he would "get no more than 2 or 3 years in a mental institution."

According to defendant, Officer Biebel threatened, slapped, and kicked him while Officer Jones was out of the room. Biebel also promised to secure help for defendant if defendant would cooperate. When Biebel left the room, Jones would come in and tell defendant he "could keep Biebel off" defendant only if defendant talked. When Biebel brought more photographs, defendant said he knew nothing about them.

Defendant stated that he was not taken to a restaurant on the evening of August 9, 1979, and he did not leave the station that night. On August 10, when defendant was returned to the interview room, Biebel began beating him after Jones left. Biebel hit him in his ribs and side and kicked him for about 20 minutes. On the evening of August 10, defendant was taken to an address on North Kenmore.

Defendant was uncertain as to when he signed the statement. He did not know whether or not assistant State's Attorney Faklis gave him *Miranda* warnings. Faklis did not ask defendant whether he had been treated well. Defendant said that he signed the statement but did not get a chance to read it.

At the close of the hearing, the court denied the motion to suppress statements made by defendant.

Testimony at trial established the following.

On November 16, 1976, at about 8 p.m., Susan Dietz went to the

apartment hotel where her mother, Frances Parro, lived. The building is located at 5417 North Kenmore, in Chicago. When Dietz attempted to contact her mother by calling her on the lobby phone, a woman answered. Dietz asked the woman to bring Parro to the telephone. When the woman returned, she said, "My God, I think she's dead. She is laying in a pool of blood."

Parro was found lying on her back with a large gaping wound in her neck. She wore a sweater, a dress, which was pulled up about her waist, and pantyhose which were split and pulled down around her knees. The lower portion of her body was exposed. Police recovered a blood-stained towel and a Chicago Tribune newspaper dated November 16, 1976. No fingerprints were recovered and there was no sign of a forcible entry. The medical examiner gave as the cause of death a slash wound of the neck.

Officer James Jones testified that on August 10, 1979, around 1 p.m., defendant, after *Miranda* warnings, informed him and Officer James Biebel that he had once killed a woman in November 1976 in a building at 5417 North Kenmore. Defendant had killed the woman during a burglary. Officer John Philbin also testified that defendant had confessed to the Parro murder. Emmett Smith, a court reporter, and Nicholas Faklis, an assistant State's Attorney, described the circumstances under which defendant made two statements and signed them in their presence. Defendant's confession was then introduced into evidence.

Defendant's confession was made at 1:26 a.m. on Saturday, August 11, 1979. Those present besides defendant were Faklis, Jones, Philbin, and Smith. *Miranda* warnings were given to defendant which he said he understood. Defendant stated that on the evening of November 16, 1976, he went to 5417 North Kenmore to burglarize any apartment. Defendant's cousin, Joe Patterson, lived in the building. His cousin was not at home, so defendant went up to the fifth floor and listened at doors and turned knobs to see whether the doors would open. Defendant wore burglar's gloves. When defendant came to a door that was unlocked, he went in. No one was in the apartment. While looking around for valuables, an elderly woman entered. When she saw defendant, she asked him what he was doing there and what he was looking for. As defendant walked passed Parro to get to the door, she grabbed him and began screaming for help. During the struggle, defendant cut Parro's throat with a pocket knife. Thereafter, defendant grabbed a towel and wiped off the blood. Then he ripped Parro's pantyhose and cut off her panties. Defendant did not sexually molest the dead victim because he was afraid someone might enter. Defendant then left the building.

At the end of the statement, defendant said that he had been fairly treated. At 4:37 a.m., defendant signed the statement which was also signed by Jones and Faklis.

The defense made an offer of proof which was denied by the court. The defense introduced a picture of the room in which defendant was interviewed. Kevin and Joseph Patterson, cousins of defendant, testified that on the day of the murder, defendant was with them at the house of Kevin's aunt. A motion to exclude defendant's five prior rape convictions was denied. But, on the next day, the prosecution stated it would be willing to stipulate to the count of rape in five indictments and not include other charges so that defendant would be able to present his defense. The defense asked for a continuance to Monday which the court denied, saying it would allow the defense 30 minutes to prepare defendant to testify. Defendant did not testify in his own defense. The jury found him guilty of burglary and murder. He was sentenced to 6 2/3 to 20 years for burglary and 500 to 1500 years for murder, the sentences to be served consecutively.

Defendant's first contention is that the delay in taking him before a judge on approved charges at the first scheduled court date contributed to an involuntary confession. Defendant was scheduled to appear in court on rape charges at 11 a.m. on August 10, 1979. But, the police put a "hold" on him because he had informed them of numerous serious crimes he had committed. According to defendant, this delay, together with alleged physical mistreatment and psychological pressures, rendered his confession in the early morning hours of August 11 involuntary and, therefore, inadmissible. In defendant's opinion, if he had been taken to court as originally scheduled, the judge would have informed him of his right to counsel and a public defender would have been appointed.

Defendant's argument is without merit for two reasons: (1) the trial court properly found that defendant's confession was voluntarily made, and (2) the delay in charging defendant was reasonable.

■■ Defendant's allegations of physical mistreatment and psychological pressures were uncorroborated. Defendant had been given *Miranda* warnings at least five times before he made the statement. When defendant was informed of his rights, he stated that he understood them. His decision to make a statement and not to request a lawyer is sufficient evidence that he knew his rights and chose not to exercise them. (*People v. Higgins* (1972), 50 Ill. 2d 221, 227, 278 N.E.2d 68, 72.) The trial court's finding that defendant's confession was voluntarily made will not be disturbed upon review unless it is contrary to the manifest weight of the evidence. (*People v. Donalson* (1977), 50 Ill. App. 3d 678, 687, 365 N.E.2d 658, 664-65.) We hold that the trial court's finding of voluntariness is not contrary to the manifest weight of the evidence.

■■ Illinois law (Ill. Rev. Stat. 1979, ch. 38, par. 109—1) provides that a person arrested without a warrant shall be taken before a judge without unnecessary delay. In the instant case, defendant had admitted that he

had committed other serious crimes. It was reasonable for the police to investigate these other crimes before formally charging defendant. Police have reasonable latitude to fully investigate a crime. (*People v. Jackson* (1961), 23 Ill. 2d 274, 280, 178 N.E.2d 299, 302.) Furthermore, delay does not render statements made before defendant was charged *per se* inadmissible, but is just one circumstance to be considered in determining the voluntariness of a statement. (*People v. Jackson* (1961), 23 Ill. 2d 274, 280.) Therefore, we hold that defendant was taken before a judge without unreasonable delay.

At trial, defendant made an offer to introduce evidence that Joseph Conard might have murdered Parro. Conard had been evicted from the building and had been a suspect in the murder because he had assaulted two residents of the building. According to police reports, a bracelet with blood and human hair on it had been found in Conard's apartment together with a key that fit the front door of the building at 5417 North Kenmore. A resident of the building had told police that she had seen Conard and Parro together several times. The defense attorney wanted to call the police officers who made the reports containing this information. Defendant urges that this hearsay testimony should have been admitted under Federal Rule of Evidence 804(b)(5) because it was taken in circumstances which guarantee its trustworthiness.

■■ Evidence connecting a third person with the commission of a crime may be shown if and when the third person has been closely linked to the commission of that crime. (*People v. King* (1978), 61 Ill. App. 3d 49, 52, 377 N.E.2d 856, 859.) In this case, defendant did not show that Conard was closely linked to the Parro murder. Police released Conard when they found no evidence in his apartment linking him to the crime and when he passed a polygraph examination. Furthermore, the statements made to the police were remote in time, having been made in November 1976 when the crime occurred, 4 years before the trial. None of the witnesses were available to testify and their statements were inadmissible hearsay. The statements were not made under oath and there were no guarantees of their trustworthiness. We conclude, therefore, that the trial court properly rejected defendant's offer of proof.

Defendant's next contention is that it was error for the trial court to change its ruling with regard to the use of prior convictions to impeach defendant. On Thursday, November 20, 1980, the court ruled that defendant could be impeached with all 26 counts of a previous indictment. These counts included rape, burglary, deviate sexual assault, home invasion, and robbery. On the next day, the prosecution stated that it would limit impeachment of defendant to five prior rape convictions so that defendant could testify. The court allowed the defense attorney one-half hour to prepare. Defense counsel claimed this was insufficient time and

did not put defendant on the stand. On appeal, defendant claims this ruling denied him the opportunity to explain the circumstances of his confession.

In *People v. Montgomery* (1971), 47 Ill. 2d 510, 516, 268 N.E.2d 695, 698, our supreme court held that prior convictions may be admitted to impeach defendant when three conditions are met: (1) the prior conviction was punishable by death or imprisonment in excess of 1 year or was a crime involving dishonesty or false statement; (2) no more than 10 years has elapsed since the date of conviction or the release of the witness from confinement, whichever is the later date; and (3) the trial court determines that the probative value for impeachment purposes is not substantially outweighed by the danger of unfair prejudice.

■■ In the instant case, use of the prior convictions meets all these requirements. The prior convictions all were felony convictions which were less than 10 years old. The trial court held that they were material. The convictions were probative of defendant's credibility and outweighed the danger of unfair prejudice. Therefore, we hold the trial court's ruling that the five prior convictions might be used to impeach defendant if he chose to testify was proper. Defendant waived his right to testify and was not precluded from presenting his coerced confession defense to the jury.

Defendant's final contention is that his murder sentence of 500 to 1500 years is excessive because it precludes any restoration of defendant to useful citizenship. The Illinois Constitution provides that all penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. (Ill. Const. 1970, art. I, §11.) This requires balancing between the interest of protecting society and the possibility of rehabilitation of the offender. (*People v. Belcher* (1980), 92 Ill. App. 3d 237, 243, 415 N.E.2d 1120, 1125.) The imposition of a sentence is a matter of judicial discretion. Absent an abuse of that discretion, a reviewing court will not alter the sentence imposed. *People v. Belcher* (1980), 92 Ill. App. 3d 237, 243.

■■ The trial court observed defendant during the trial, heard the evidence against him, including his signed confession, considered the nature of the murder, and the presentence report showing defendant's previous convictions. We hold that the trial court did not abuse its discretion in imposing the sentence.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

ROMITI and JIGANTI, JJ., concur.