THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHNNY ORTIZ, Defendant-Appellant.

Fifth District    No. 5—88—0603

Opinion filed February 14, 1992.

HOWERTON, J., dissenting.

Daniel M. Kirwan and Edwin J. Anderson, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Mark Howard Clarke, State's Attorney, of Cairo (Kenneth R. Boyle, Stephen E. Norris, and Debra A. Buchman, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE GOLDENHERSH delivered the opinion of the court:

After a jury trial, defendant, Johnny Ortiz, was found guilty of aggravated battery in violation of section 12—4(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 12—4(a)) and was sentenced to five years in the Department of Corrections. On appeal, defendant seeks to have his conviction reversed and the cause remanded for a new trial. Defendant asserts that his appointed defense counsel committed errors which denied him effective assistance of counsel. We agree with defendant. Accordingly, we reverse and remand for a new trial.

Defendant was charged with the aggravated battery of his girl friend, Cassandra Harbor. The case went to trial on July 26, 1988. During opening statements both the State and defendant gave their synopsis of what they believed the evidence would show. Defense counsel stated that the defense would present evidence that the victim had another boyfriend, Joe Robbins, in addition to defendant. He also stated that the evidence would show that when police stopped Robbins to question him concerning the incident in question, Robbins was armed with two knives. After opening statements, the State presented its case.

The State first called the victim, Cassandra Harbor. She testified that on the evening of June 2, 1988, she was alone in the apartment she shared with defendant. She had taken off her clothes and was looking for a robe when she heard someone enter the apartment. The room was basically dark, but she heard someone mumbling. Through this mumbling, Harbor was able to identify defendant. She continued to look for her robe when she was hit on the back of her head. She fell to the floor and was kicked in her side, turned over, and cut on her face. She identified a carpet cutter, which was also referred to as a box cutter throughout the trial, as the weapon with which she was cut. This box cutter was retrieved by police from a chest of drawers in defendant's apartment and introduced into evidence. Harbor identified defendant as her attacker. She stated that she was able to see him during the attack with the assistance from the light from the television which was operating in the room at the time of the attack. Harbor admitted that on June 2, 1988, she had consumed a pint of vodka, a "couple" of shots of whiskey, one shot of vodka, and some beer. Harbor stated that even though she could feel the effects of alcohol, she was not so impaired that she could not see or hear defendant. Harbor also admitted that she lost her eyesight when she was eight years old and is considered legally blind.

After the attack, Harbor went to the hospital where she received eight stitches for the lacerations above her eye. Upon her release from the hospital, she went to her grandmother's residence. Soon thereafter, she returned to defendant's apartment. Defense counsel attempted to ask Harbor about Joe Robbins during cross-examination. The State objected to this line of questioning on the basis that the evidence was irrelevant and beyond the scope of direct examination. This objection was sustained. During the course of the trial, defense counsel did not attempt to call Harbor in order to elicit information concerning Joe Robbins and his relationship with Harbor.

The next witness to testify was Dr. Carronogan, the victim's personal physician, who treated her for injuries sustained on June 2, 1988. Dr. Carronogan stated that the victim's injuries could have been the result of a beating and that the victim's facial laceration, which required eight stitches, could have been caused by the box cutter retrieved by the police. On cross-examination, Dr. Carronogan admitted that any type of knife could have caused the victim's facial cut.

Detective Sergeant Rushing of the Cairo police department investigated the incident. On June 2, 1988, at approximately 9 p.m., he received a call to go to defendant's apartment. When Rushing arrived, he found Harbor on the floor, naked, with blood all over her head and arms and with a pool of blood underneath her. Harbor, who was unconscious, was then taken to the hospital by emergency medical technicians. According to Rushing, defendant gave the police permission to search his apartment. During the search, the box-cutter knife was found. There was no blood on it. Defendant was taken to the police station for questioning. He denied attacking Harbor. Defendant explained that he had found Harbor and had gone to a neighbor's residence to summon help by calling the police and an ambulance. According to Rushing, defendant acknowledged having told persons at a bar earlier in the day that he was going to "go home and kill the bitch," referring to Harbor. Defendant also told Rushing that he always makes threats concerning Harbor and it seems that every other night he "whips her ass" or "she whips his." Defendant admitted to Rushing that earlier in the day he had been drunk. Defendant was allowed to leave the police station, but he returned later to say that Harbor was on his porch and that he wanted her removed. Harbor was removed and taken to the police station in the early hours of June 3, 1988. After Rushing's testimony, the State rested.

Defendant took the stand in his own defense. He stated that for the past three years he has had a somewhat rocky relationship with Harbor. On June 2, 1988, the two were living together and getting along fine. On that morning, defendant woke up at about 9 a.m. and spent time watching television and working on stereo equipment. Harbor was with him, and the two began drinking. Harbor became extremely intoxicated and pulled a knife on defendant at 10 or 11 a.m. Defendant stated that he knocked Harbor down and she started acting more sensibly, so the two "laughed it off." Defendant, Harbor, and their upstairs neighbor, Leroy Jones, ate lunch together. Later, defendant and Harbor went to a bar and drank. Harbor left on a bicycle but returned later. Defendant did not spend much more time with Harbor. Later in the evening, defendant went back to his apartment. There were no lights on when he entered the apartment, and he stumbled over something. Defendant turned on the lights and discovered Harbor lying facedown, unclothed, and bleeding. Defendant went to his neighbor's house and called the police. Both an ambulance and the police arrived. Defendant was taken to the station and questioned. After he was released, he went

home and found Harbor sitting on his porch. Defendant went back to the police station and asked the police to remove Harbor because "she's a trouble maker, and she was drunk." Defendant denied attacking Harbor. On cross-examination, defendant stated that he does not remember saying that he was going home "to kill the bitch." On redirect examination, defense counsel attempted to question defendant about Joe Robbins and whether during conversations with police, defendant told police about Robbins. The State objected to this line of questioning on the basis that it was beyond the scope of cross-examination. The trial court sustained the objection. The defense rested.

A certified copy of defendant's probation order and his plea of guilty in a 1985 retail theft was introduced into evidence. A judgment order showing defendant's conviction for voluntary manslaughter and his release from prison within the last 10 years was also introduced by the State. The trial recessed for the day with the intention that on the next morning the instruction conference would be conducted and the parties would deliver their closing argument.

The next day, defense counsel made an oral motion to reopen defendant's case. Defense counsel advised the court that Leroy Jones had not been present in court the previous day, but that defense counsel had just called him and Jones agreed to come to court and would be there momentarily. The State argued against allowing the defense to reopen its case, but the trial court allowed the testimony.

Jones testified that he is friends with defendant and lives in the apartment above defendant's. He stated that on June 2, 1988, he had lunch with defendant, Harbor, and Brenda Jones. Later in the evening, he did not hear any disturbance in the apartment below him. The police came and took him and Brenda down to the station where both gave statements. Later in the evening, Harbor returned drunk to defendant's apartment. Leroy Jones saw defendant come home from the police station only to return again in order to have Harbor removed. The defense rested again, and both sides presented closing arguments. The jury began deliberations. During deliberations, the jury sent two letters to the judge signed by the foreman. The second letter stated "some members feel he is guilty but didn't see enough evidence to convict. They don't know what to do." The trial judge sent a letter in reply which stated, "Please, reread the jury instructions." Ultimately, the jury convicted defendant. Prior to sentencing, defendant filed a *pro se* post-trial motion which, among other things, alleged that his trial counsel had incom-

petently represented him. The trial court denied defendant's motion as both untimely filed and without merit.

Defendant's contention on appeal is that he must receive a new trial because he was denied effective assistance of counsel due to his trial counsel's demonstrated lack of knowledge of fundamental legal rules, procedures, and techniques. The State replies that defense counsel's representation of defendant was not such that it adversely affected the outcome of the trial, and, therefore, cannot be considered ineffective.

■ In order to obtain a new trial premised on the denial of effective assistance of counsel, defendant must show both ineffective assistance and resulting prejudice. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Weir* (1986), 111 Ill. 2d 334, 337, 490 N.E.2d 1, 2; *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 425-26, 475 N.E.2d 840, 845; *People v. Albanese* (1984), 104 Ill. 2d 504, 526-27, 473 N.E.2d 1246, 1255.) To establish prejudice, the defendant must show a reasonable probability that absent his counsel's unprofessional errors, the result would have been different. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *Weir*, 111 Ill. 2d at 338-39, 490 N.E.2d at 2.) A reasonable probability is one sufficient to "undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

The alleged ineffective assistance in the instant case came in three areas. First, defendant argues that his defense counsel failed to develop any evidence to support his assertion during his opening statement about the existence of another suspect, Joe Robbins. Second, somewhat related to the first issue, defendant contends that his appointed counsel did not realize that matters covered in cross-examination and redirect examination are limited to the scope of the preceding examination. Because these issues are related, we will address them together.

During his opening statement, defense counsel stated that the victim was having a relationship with a person named Joe Robbins in addition to her relationship with defendant. Defense counsel asserted that the evidence would show that when the police stopped Robbins, Robbins was armed with two knives. From these comments, it is apparent to us that defense counsel's planned defense in this case was to show that Robbins, not defendant, committed the assault against Harbor or, at least, to leave a reasonable doubt in the jury's mind as to who committed the assault. Defense counsel

made some attempts to adduce testimony concerning Robbins. The first attempt came during cross-examination of the victim:

"Q. Do you remember talking to an individual named Joe Robbins?

A. No.

Q. Have you ever met any individual named Joe at 606 Walnut?

MR. CLARKE [STATE'S ATTORNEY]: Objection your Honor, this is irrelevant and beyond the scope of direct examination."

The objection was sustained. No reason for the trial court's ruling was given. It is clear that such testimony was beyond the scope of direct examination.

While a defendant may generally attempt to prove that someone else committed the crime with which he is charged, limitations to admissibility exist. (*People v. Bryant* (1982), 105 Ill. App. 3d 285, 291, 434 N.E.2d 316, 320; *People v. King* (1978), 61 Ill. App. 3d 49, 52, 377 N.E.2d 856, 859.) Such evidence may be rejected if speculative, irrelevant, or immaterial. (*People v. Luigs* (1981), 96 Ill. App. 3d 700, 706, 421 N.E.2d 961, 966.) The trial court has broad discretion in ruling on materiality and relevancy issues, and its ruling will only be reversed if there is a clear showing of abuse of such discretion. *People v. Castro* (1989), 190 Ill. App. 3d 227, 239, 546 N.E.2d 662, 669.

In the instant case, it is impossible for us to determine whether testimony concerning the existence of Joe Robbins was relevant or of probative value because defendant's theory that Robbins was the perpetrator was left virtually unexplored. Defense counsel could have certainly attempted to elicit such testimony concerning Robbins had he called Harbor as an adverse witness during the defense portion of the trial. No such attempt was made. If defense counsel had called Harbor back to the stand, the State would have likely renewed its relevancy objection. If the objection was sustained, it would have been proper for defense counsel to make an offer of proof. Without defense counsel knowing the proper procedures in which to develop his stated theory of the case, that Joe Robbins, not defendant, committed this crime, the trial court was unable to determine whether such evidence was remote or relevant and we are unable to consider that determination on review.

The only other attempt by defense counsel to develop his theory of the case was during his redirect examination of defendant:

"Q. At what point in your conversation with the police did you tell them about Joe Robbins?

MR. CLARKE: Objection, this is beyond the scope of cross examination.

THE COURT: Overruled, he may answer.

A. I didn't.

Q. You didn't tell them about Joe Robbins.

A. If we're talking about back on the 2nd at the police station, I did not mention a Joe Robbins.

Q. No, we're talking about in general, did you ever tell—

MR. CLARKE: We renew our objection, this is beyond the scope of cross examination.

MR. BEARD: Your Honor, they are going into what the police report he made to the police and whether or not he had his *Miranda* rights and all —

THE COURT: And this is related? On some different occasions? You're talking about some other dates now.

MR. BEARD: I didn't know what date it was for sure.

THE COURT: It was a later date then, the objection will be sustained. Proceed.

Q. No further questions."

These were the only references made about Joe Robbins during the presentation of evidence. The State's Attorney rightly pointed out during closing statements that the defense had failed to produce the promised evidence concerning the existence of another suspect, Joe Robbins.

After a complete examination of the record, it is clear to us that defense counsel did not know fundamental rules concerning witness examination, specifically, that matters covered in cross-examination and redirect examination are limited to the scope of the preceding examination. (*People v. Howell* (1977), 53 Ill. App. 3d 465, 469, 368 N.E.2d 689, 692.) The prejudice necessary for a reversal in the instant case came from defense counsel's failure to present any evidence concerning the existence of a person named Joe Robbins following defense counsel's opening statement indicating to the jury that Robbins was another suspect in the case. A similar situation occurred in *Anderson v. Butler* (1st Cir. 1988), 858 F.2d 16, in which the defense counsel failed to present expert psychiatric testimony as promised in his opening statement.

In *Anderson*, the defense attorney indicated in his opening statement that he would call a psychiatrist and a psychologist who would testify in support of defendant's claim of mental impairment.

During the trial, the defense attorney failed to present any expert medical testimony concerning the defendant's state of mind even though the experts were available. The defendant was found guilty of first-degree murder. The *Anderson* court concluded that the defense counsel's failure to produce this promised expert testimony was prejudicial and constituted ineffective assistance of counsel. Specifically, the *Anderson* court stated:

> "[W]e cannot but conclude that to promise even a condensed recital of such powerful evidence, and then not produce it, could not be disregarded as harmless. We find it prejudicial as matter of law." (858 F.2d at 19.)

Likewise, in the instant case, we believe that defense counsel's failure to produce promised evidence concerning the existence of another suspect, Joe Robbins, was prejudicial.

The note sent by the jury foreman to the judge stating that some of the jurors felt that defendant was guilty "but didn't see enough evidence to convict" indicates that the evidence in the case was close. Clearly, the victim, who was legally blind and who was drunk at the time of her attack, was not the most convincing witness. There is a reasonable probability in our minds that absent defense counsel's errors in failing to produce promised testimony and in failing to know the limitations of cross-examination and redirect examination, the result would have been different. *Strickland v. Washington* (1984), 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *People v. Weir* (1986), 111 Ill. 2d at 338-39, 490 N.E.2d at 2.

For the foregoing reasons, the judgment of the circuit court of Alexander County is reversed and the cause remanded for a new trial.

Reversed and remanded.

RARICK, J., concurs.

HOWERTON, J., dissenting:
I respectfully dissent.

A defendant in a criminal case who chooses to defend by claiming someone else committed the crime must prove, not merely suggest, that that someone else in fact committed that crime. (See *People v. Bruce* (1989), 185 Ill. App. 3d 356, 541 N.E.2d 708, *appeal denied* (1990), 129 Ill. 2d 566, 550 N.E.2d 559; *People v. Bryant* (1982), 105 Ill. App. 3d 285, 434 N.E.2d 316; *People v. Velillari*

(1980), 84 Ill. App. 3d 333, 405 N.E.2d 466.) Since counsel is presumed to know the law, defense counsel in this case must be taken to have known of this requirement. In this case, however, counsel did not prove the guilt of someone else and in fact did not even begin to undertake that proof. Instead, counsel suggested that a man named Robbins rather than defendant was guilty and "wafted" this suggestion into the jury box by innuendo and by asking questions to which objections were sustained.

In tandem with this improper technique, counsel, on cross-examination of the victim, the only eyewitness to this crime, established that she drank a pint of vodka, a "couple" of shots of whiskey, a shot of vodka, and some beer, and then went home to her apartment. It was the dead of night. She went in. She heard someone enter her apartment. The lights were off. It was dark. Her eyesight was so bad she is legally blind. She never saw whoever came in. She turned away to get her robe. She was hit on the back of the head. She fell facedown, rolled over and was kicked in the side and cut on the face and passed out. This seems to me to be a pretty "fair-to-middlin' " job of establishing that the victim, the only so-called, "eye" witness, lacked the ability and opportunity to see her assailant, and therefore, her credibility was suspect when she identified defendant.

Defense counsel may be generally competent or generally incompetent. We do not know, nor do we care, about general competence, for that is not the test. We care, rather, only about counsel's performance in this specific case, and we can judge it only from what we see in the record.

I believe that implicit in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, is the notion that a case should be reversed for incompetency of counsel's performance when incompetency is the only reasonable inference that can be drawn from the record. In this case, however, there are two reasonable inferences that may be drawn from the record: (1) the one the majority has drawn; and (2) the one which I have not expressly stated herein, but have imbedded in the facts above and allowed the reader to draw unassisted.

There being two inferences, one of which adds up to standing sort of at shadow's edge of impropriety, but competent lawyering nevertheless, I must dissent.